Nott, J.,
delivered the opinion of the court:
When the cases arising under that statute which has been familiarly known as the Twenty per cent. Resolution, (14 Stat. L., p. 569,) first came before this court, it was held that they fell into two general classes. The first class, it was thought, consisted of those persons who were uin the civil sen- *304 ice of the United States at Washington, and whose salary or pay was “ directly fixed or indirectly limited by law.” The second class, it was supposed, consisted of those persons whose services were sueh as might be rendered to any employer, whose wages came under the restrictions of no statute or departmental regulation, and who received for their services whatever such services might be worth in the place where they were rendered. There are indeed services not necessarily connected with the Government as a government, such as those of the public gardeners, but Congress have attached to them the characteristic which distinguishes the civil service from ordinary employments, namely, a fixed and arbitrary rate of compensation. Such cases, we thought, fell within the first class, not because of the nature of the services rendered, but because Congress had placed them there by making them quasi public employments.
The first class of cases (including those just referred to) was carried to the Supreme Court by appeal, and the judgment of this court affirmed. The second class has never been taken to that tribunal. But it is said that the attention of the Supreme Court was called to them upon the argument of the first, and that the broad language used in the opinion of that court was intended to cover all cases that could possibly arise under the Joint Besolution. The Supreme Court does indeed say that persons are “ properly in the civil service, if they were employed by the head of the Department, or of the Bureau, or any division of the Department charged with that duty, and authorized to malee sueh contracts, and fix the compensation of persons employed, even though the particular employment may not be designated in any appropriation act. ” And the court adds, that •“ many persons not employed as clerics and messengers of the Departments are in the public service by virtue of an employment by the head of the Department or by the head of a Bureaxt, of the Department atithorized by law to make sueh contracts, and such persons are as much in the service, within the meaning of the Joint Resolution, as the clerks and messengers employed in the rooms of the Department building.” (The Twenty per cent. Cases, 7 C. Cls. R., p. 290.)
Notwithstanding the scope of this language, and the assertion thatthe attention of the Supreme Court was called to the numerous classes of cases awaiting decision here, we remain of our *305 former opinion, namely, that the cases fall into two classes: the former consisting of persons whose compensation was arbitrarily fixed or indirectly limited by Congress; the latter, of persons whose wages were unrestricted and determinable only by their highest market value at the place where they were rendered.
As to the reasons upon which this distinction stands, it is sufficient to quote what this court formerly said in Baker's Case, (4 C. Cls. R., p. 227:)
a There have always been, and were when the Joint ^Resolution was passed, two classes of persons in the employment of the Government. . The first consists of those whose services are special and to be distinguished from ordinary employments. They make up the civil service of the United States, and their compensation is ‘directly fixed, or indirectly limited, by law. The second class consists of those persons whose services are such as might be rendered to any employer, whose wages come under the restrictions of no statute, and who receive for their services whatever such services may be worth in the place where they happen to be rendered. For services which are connected with the Government as a government, and which, being special, have no market value, the salary, pay, or other compensation is necessarily fixed by law; but where the Government has become a builder or manufacturer, it has never attempted to regulate-by law the fluctuating value of labor, which, as with other commodities, competition and the business of the country would control despite legal restriction, nor to overbid other employers in the labor market, but has paid to its artisans and workmen the same prices for their industry which other employers might be paying for the same services in the same place. Generally this policy has been left -to regulate itself between the demands of labor on the one hand and the restraining duty of the officers charged with the hiring of workmen on the other. Occasionally it has been prescribed by law. Concerning persons in the civil service, we find in the statutes constant reference to the ‘pay authorized, by lato.’ In the Act 23d April, 1854, (10 Stat. L., p. 276,) to that of 1 messengers' and ‘voatchmen' of the different Executive Departments of the Government in Washington, and to that of the cpiiblie gardener' and the ‘police at the Capitol;' in the Act 18th August, 1856, (11 Stat. L., p. 145,) to that of ‘ laborers in the employ *306 ment of tbe Government in tbe Executive Departments and on the public grounds in the city of Washington/ which, for example, the act fixes at ‘an annual salary of $600 each / in the Act 14th March, 1864, (13 Stat. L., § 6,) to that of ‘females whom the heads of Departments are authorized to employ’ ‘ at an annual compensation not exceeding $600 / in the Act 2d March, 1865, (13 Stat. L., pp. 445, 450,) to that of ‘ temporary clerics,’ with a special proviso that they £ be classified according to the character of their services.’ But, with respect to persons not in the ‘ civil service,’ we find no provisions of law regulating their pay, except such as direct that ‘.the hours of labor and the rate of wages of the employés in the navy-yards shall conform, as nearly as is consistent with the public interest, with those of private establishments in the immediate vicinity of the respective yards.’ (Act IQth July, 1862, 12 Stat. L., p. 587.)
“At the time when the Joint Resolution was passed the compensation of the great body of persons in the civil service at the seat of Government had been left for a long time unrevised and had fallen into great disorder. By reason of the depreciation of gold and silver and the still greater depreciation of paper-money, wherewith these persons were paid, their compensation had become incommensurate with the increased expenses of the times, and particularly with the increased values set upon property and tenements in the city of Washington, and had fallen far behind the increase allowed by the Government to that other body of persons whose rate of compensation kept pace with that paid by private employers. Thus, the very officer of the Treasury whose decision stopped the payment of these claims, and upon whose judgment depended in this matter alone more than, half a million dollars, was at that time receiving exactly the same compensation received by one of these claimants, and tbe average of them all fell but 30 per cent, below his salary. That salary had not been increased since 1799, Act 2d March, 1799, (1 Stat. L., 720;) and but once since the office of Comptroller of the Treasury was established in 1789, Act 2d September, 1789, (1 Stat. L., p. 65.) On the contrary, it had been diminished by being paid in depreciated paper-money instead of gold and silver. The members of that Congress which fixed the Comptroller’s salary at $3,500 a year themselves received but about $1,200. The per diem allowance received by them in fact amounted, for the three laborious ses *307 sions of their two years’ term of office, to $2,406. But the pay of that Congress which passed this 20-per cent, resolution had advanced to $5,000 a year, exclusive of mileage. The expenses of life had also more than trebled between 1799 and 1867. Taking them at the standard, we may estimate that the Comptroller’s salary in 1867 should have been $9,000 a year in gold; or, taking the congressional salary at the standard, we may conclude that if the Congress which increased the pay of Comptroller in 1789 had legislated in 1867, they would have advanced the salary to $12,000 a year in Treasury notes.
“A third standard of comparison may be found in the wages paid to these claimants, for it is pretty certain that the artisans of that day would not have received (in gold) a fourth part of the Comptroller’s salary; whereas these have received in the average 70 per cent, of his salary, and in one case an amount exactly equal.
“ In these intervening seventy years the daily toil of the artisan has diminished, but the labor and duties and responsibilities of the Comptroller’s Office have been vastly augmented. They embrace the work of examining all accounts settled by the First and Fifth Auditors, and of certifying the balances arising thereon to the Register;-of countersigning all warrants drawn by the Secretary of the Treasury which may be warranted by law; of reporting to the Secretary the official forms to be issued to the different officers for collecting the public revenue, and the manner of keeping and stating the accounts of the persons employed therein; of superintending the preservation of the public accounts subject to his revision, and providing for the payment of all moneys which may be collected ; of superintending the recovery of all debts due to the United States, and directing legal proceedings to enforce their prompt payment, and of laying before Congress annually a list of such officers as shall have failed to make the settlements required by law. [Act 3d March, 1817, 3 Stat. L., p. 367, §§ 8,10,13, 14.) The single requirement that all warrants drawn by the Secretary of the Treasury, ‘ which shall be warranted by law,’ be countersigned by the Comptroller, obliges that officer to pass, to a certain extent, upon the legalityof every payment made by the United States; and in the fiscal year to which this twenty per centum applies there were 40,814 warrants drawn, requiring of the Comptroller 40,814 signatures, given with his own hand.
*308 “ But these cases furnish a further illustration. They disclose forty-five bank-note printers, in a Bureau of the Treasury, whose yearly wages amounted to $111,024. The largest received by any one man was $3,500; the smallest $2,039; three of the forty-five were above $3,000; fifteen above $2,500; all but nine above $2,200. In the same Bureau the employés of the civil service, who were watchmen or laborers, received but $600; those who were messengers but $840; those who were clerks but $1,200, $1,400, $1,600, or$l,800. The superintendent of printing, under whom these men worked, received but $2,000; the chief of the Currency division, by whom they were employed, but $3,000. The deputy comptroller of the currency, an official whose responsibilities are of so grave a nature that he is required by statute to give security to the amount of $50,000, received less than the wages paid to one-third of the workmen; and, finally, chiefs of divisions in the Auditors’ and Comptrollers’ Offices, who pass in a single year npon accounts literally embracing millions of dollars, received less than the least of these claimants.
“These salaries and pay, which Congress undertook to increase by law, were the salaries and pay which were regulated by law. Cases, indeed, are spoken of 1 where no salary is fixed, by lato;' but those were the cases of temporary clerks, persons in the civil service, and whose salaries, though not directly ‘ fixed, ’ were nevertheless indirectly limited, by law. Persons also are enumerated in certain military and naval offices, but they were persons who, acting under military and naval authority, still were, as we held in Clark's Case, (1 C. Cls. R., p. 145,) ‘ persons engaged in the civil service.’ The Joint Besolution was not a wild gratuity, a naked, needless gift of the hard-paid taxes of the nation, but was founded on an intent to do justice to those persons in the civil service who had not been compensated justly for their services. The Joint Besolution was therefore a remedial statute, to be construed by the well-known tests, 1 the old law, the mischief, and the remedy.’ The ‘old law’ here was the various statutes establishing, regulating, and limiting the compensation of persons in the civil service. Where there was no old law, and employés received for their services what they were worth among men, the new law did not apply; they who had no wrongs to be righted needed not the remedy which it provided. The ‘ mischief’ was the unjust compensation which, *309 by tbe changed circumstances of the nation, had come to be paid to persons in the civil service, occasioning irritation, discontent, and a sense of wrong in the minds of men, and leading to bribery, extortion, and other evil practices. The1 remedy 1 intended by the Joint Resolution lies not in flinging the money of people struggling with a great debt, to those who received for their services their highest market value, merely because such services chanced to be rendered at the seat of Government, where persons in the civil service chiefly are employed, but in faithfully extending the statute to all those actually 1 in the civil service of the United States’ whose compensation was restricted by law, and who, being circumscribed in their means of subsistence by the arbitrary operation of law, could look only to the law for the bettering of their condition. And therefore it is that the Joint [Resolution, though loosely and recklessly drawn, is still careful to say that the £ 20 jper centum ’ to be allowed and paid shall be to ‘persons note employed in the civil service of the United States.’’
“ The phrase limits and controls all that follows. The 'clerks, messengers, watchmen, and.employés’ mentioned are not all the persons employed by the Government at Washington, but only the persons employed in the 4 civil service ’ of the United States, and whose service was rendered within the functions of the offices named. These claimants were not persons in the civil service; they were simply hired by the job or the day to do common mechanical labor, and paid for their work all it was worth in the market. Instead of being public servants, they were merely public contractors. ' The Government owes them no gratuities more than it owes all other, contractors, and it has paid to the least of them more than double the average which it pays to persons in the civil service at Washington. ‘ It is the business of the judges so to construe the act as to suppress the mischief and advance the remedyand we shall most assuredly do so if we extend it to all who are both within the letter and the spirit of the Joint [Resolution, and to none beside.”
The cases now before the court present several distinct questions additional to the general question before considered, and fall into the additional classes:
*310 i — Plate-printers in the Bureau of Bngraving and, Printing in the Treasury Department.
'These men were employed as printers and paid at an agreed rate for the amount of work done. They were allowed to employ assistants, who were paid from their earnings, though paid directly by the disbursing officers of the Department, the sums thus paid being deducted from the gross earnings of the claimants. The evidence before us does not show the amount of the gross earnings, but only of the balance or net earnings after the assistants had been paid. If these men are entitled to recover the twenty per cent., it seems clear to us that it must be estimated, andean only be estimated, upon the gross earnings paid to them by the Government. The Government was a stranger to their assistants in a legal sense, and was concerned oDly in the gross amount paid to them. It is not pretended that the assistants could in their turn come in and claim twenty per cent, upon the amount allowed them by their employers, the plate-printers. And it is to be noted that the net earnings in some cases exceeded $3,000 per annum, and non constat but that the gross earnings may have exceeded $3,500 per annum.
The Joint Resolution is limited by the terms of the second Tiroviso to'persons utohose salaries, as fixed by law,” doubt “ exceed $3,500 per annum.'” Did Congress ever contemplate giving-twenty per cent, upon the earnings of one man whose compensation exceeded $3,500 per annum, and withholding it from another whose salary was fixed by law: above that amount 1 We think not. The proviso indicates that the pay to be increased was pay ‘fixed by law;” and our conclusion, is, that though these men were employes in one sense within an Executive Department, yet they were not persons “ in the civil service of the United States” within the meaning of the Joint Resolution, but contractors, whose contract-work, from prudential reasons, was brought within the immediate supervision of an Executive Department.
II. — Laborers on the Treasury Extension.
The evidence of the Supervising Architect in this class of cases very clearly illustrates the actual existence of the legal classification which this court, as before stated, originally made. *311 He says: “ The labor performed by them was not rendered as duties of civil employés, for whose services as such any appropriation for the civil service of the Government at Washington provided compensation. Specific appropriations were made for the construction of the north wing of the Treasury building. Under such appropriations contracts areentered into for finished worls, comprehending both materials and labor; materials separately, and labor by the day separately. The services of the parties in question were rendered under the latter contract. The consideration agreed upon for their labor was the highest market wages. The. payments upon each of these contracts were made from the specific appropriations above mentioned.” We think that persons whose services were rendered under contracts for “ finished work,” at the “ highest market wages,” ■cannot be considered as employés in the civil service.
III. — Laborers in the Commissary Department.
It is noticeable that while the Quartermaster Department is enumerated in the Joint Resolution and also the Commissary-General of Prisoners, yet that the Commissary Department is unnamed. These cases present the question whether the Commissary Department is a part of the army or a Bureau of the War Department. The earlier and the later statutes generally treat the Commissary-General as simply a military officer, though there is one statute which indicates that the office is a “ military Bureau” of the War Department. Aet ith July, 1836, (5 Stat. L., § 5. p. 117.) The Joint Resolution extends to li the following-named Departments or any Bureau or division thereof ',” and among these Departments is the War Department. If it was intended to include under the term “Bureau” or, “division” the Commissary Department, it was needless to specifically name the Quartermaster Department. On the contrary, it is not easy to understand why it should have embraced the other military Bureaus, such as the Paymaster-General, the Commissary-General of Prisoners, the Bureau of Refugees, the Quartermaster, and have omitted the Commissary Department. If the usual rule of construction be applied, the naming of some of these military Bureaus in the Joint Resolution must be deemed to exclude -those not named. But it is at the same time a moral certainty that Congress never intended to exclude one military Bureau *312 while it benefited all the rest. The history of this piece of legislation shows that it was made up of numerous amendments, hastily thrown together; and our conclusion is that it was intended to apply to the Commissary Department.
IV. — Laborers in the Medical Department-of the Army.
The same question and the same embarrassment of construction arise with regard to this class of claimants that have been pointed out in the preceding class. The Surgeon-General, in an official report on this subject, says :• u The Medical Department is not made a Bureau of the War Department by any law known to me. By the term ‘ Medical Department,’ or more correctly ‘Medical Department of the Army,’ is understood not a Bureau or office, but the entire organization of means and appliances for conserving the health of the army and taking care of the sick and the wounded.” He adds: “ The Surgeon- GeneraVs Office is recognized in the annual appropriations made by Congress as a part of the War Department, but the claimant was not in the Surgeon-GeneraVs Office.” We think that this latter fact distinguishes these cases from the preceding, and that the parties were civil employes of the army, and not in any sense in the civil service.
V. — Laborers employed by the Quartermaster Department at Washington., but ichose services ivere rendered at Arlington, &e.
However inconsistent it may seem for Congress to have allowed an increase of compensation to one man employed by the Quartermaster Department, on this side of the Potomac, and to have withheld it from another, employed by the same officer, but sent to the other side of the river, it is clear that the Joint Resolution is limited by its terms to “persons now employed in the civil service of the United States at Washington.” A person employed at Arlington is certainly not employed at Washington, although, as is claimed here, the hiring and the paying were both done in Washington. The fact that the contract of service had its,inceptiou here, and that final performance under it, that is to say payment, was also made here, does not place the employment here; and we cannot, by any liberality of construction, extend the Joint Resolution to a person whose employment was elsewhere.
*313 YI. — Employés of the Secret-Service Division of the Treasury Department.
In this class the persons employed were under the direction of the Solicitor of the Treasury, and the duty performed appertained to the Treasury Department. It consisted chiefly in the detection of counterfeiters, and the parties “ were stationed at no particular place except as their duties required.” As we have previously held in the case of Marche, (5 C. Cls. R., p. 525,) it was not the accidental presence of the claimant in the city of Washington which entitled him to the benefits of the Joint Besolution, but it was necessary that the functions of his office lie within the Treasury at the seat of Government. We do not understand that these detectives were necessarily employed here, nor, as a matter of fact, that they actually remained here. Their services were of a migratory character, and probably the smallest part of their employment was that which was rendered in Washington. Still, while liable to be sent elsewhere, they were stationed here. This was their only permanent place of official abode. Their salaries were fixed by law j they were in the civil service as assistants of the Solicitor of the Treasury, and they were in the civil service in a greater or less degree at Washington. Our conclusion is that they are entitled to recover.
VII. — Gases where the statute of limitations is pleaded.
A large number of the cases now before the court, including some in the preceding classes, were not brought until the 30th of June, 1873. The defendants set up the statute of limitations as to the eleven-twelfths of each demand. It is conceded that the suit was brought in time, so far as the last month’s pay is involved, but it is insisted that the suit is barred as to all pay accruing before the 1st day of June, 1867. If the Joint Besolution, contrary to our construction of it, extends to all employés of the Government, as well as to those in the civil service proper, it is evident that this theory of monthly payments cannot be universally applied. Some of the men were employed by the day, and some by the piece, and the question must arise whether a cause of action accrued to them strictly as each day’s work was done or each piece of work finished, or whether there *314 was a running account extending to tbe date of the last item. But with regard to those persons actually in the civil service, and entitled beyond question to the benefits of the Joint Resolution, it is undeniable that their salaries were generally paid monthly. But on looking into the statutes we do not find that there is any provision of law to that effect. The salaries are almost invariably spoken of as “ annual salaries.” Occasionally there is some provision, as in the case of the judiciary, that they be paid quarterly; but ordinarily the time of payment is not fixed by law. Further than this the Joint Resolution does not designate a time of payment. “ There shall he allowed and paid,” it says, “ an additional compensation of twenty. per centum ón their respective salaries as fixed hy law, or, tohere no salary is fixed by lato, upon their pay, respectively, for one year.” And it further provides, that where a person £< shall be only entitled to receive salary or pay for a part of said year, the said twenty per centum shall be paid on the amount such person is so entitled to receive for services within said year.” It is, therefore, by no means clear that any portion of the twenty per centum was payable until the expiration of the fiscal year, and we are inclined to say, for these reasons, that a party’s claim did not accrue until the fiscal year had ended.
Our conclusion, consequently, is that in five of the preceding classes of cases the Government is entitled to judgment. We are also inclined to believe that the Supreme Court could not have intended that its opinion should be applied to cases so inherently different from those before it as we consider the most of the present cases to be. But the language of the Supreme Court, before quoted, is broad enough to warrant an inferior tribunal to come to a directly opposite conclusion; and we are not unmindful of the fact that our conclusion is not free from doubt, and that the claimants, by reason of the smallness of their respective demands, have not the right of appeal to the Supreme Court. We therefore direct a judgment to be entered pro forma against the Government in one of each class of cases, so that the correctness of our conclusions may be reviewed by the Supreme Court. The residue of the cases which have been submitted wiH'remain under advisement until the decision of the Supreme ■Court in those appealed.
*315 Judgment will be entered for the claimants under this opinion in the following cases:
George A. Bell v. The United States for...$236 86
Patrick Welsh v. The United States for.i.108 85
John Wild v. The United States for. 124 80
James Hannan v. The United States for... 84 00
O. A. Hoffman v. The United States for. 143 60
Thomas Dorkin v. The United States for. 137 62
Maurice Tucker v. The United States for. 360 00
John Smith v. The United States for. 71 00
John Donnelly v. The United States ........ 1. 65 80
J. D. Townley'D. The United States for. 125 65
John Cullen v. The United States for. 206 96
Thomas Fugitt v. The United States for. 160 55
Charles Wood v. The United States for... .67 68
Timothy Graven-u. The United States for. 69 41
Drake, Oh. J.:
I do not wish to be considered as taking part in the decision just read.
It is my opinion that the repeal of the Joint Resolution of February 28, 1867, left this court without jurisdiction of any action for the recovery of anything thereunder. -