## J. W. & J. B. DAVIS *v.* RICHARDSON & MAY.

1. STAMP ACTS—CONGRESS HAS NO POWER TO PRESCRIBE RULES OF EVIDENCE FOR THE STATE COURTS.—The congress of the United States has not the power, under the constitution, to prescribe rules of evidence obligatory on the state courts; and therefore instruments of evidence, admissible by the law of the state, may be read in evidence, without being stamped, while persons using them are amenable to the penalties prescribed by acts of congress for failure to observe the requirements of the stamp acts.

2. SAME—INTERPRETATION—STATE COURTS NOT INCLUDED.—It is a fair interpretation of the acts of congress on the subject of stamps that the state courts were not contemplated as embraced by them.

3. PARTNERSHIP—AUTHORITY OF EACH TO BIND THE FIRM.—One partner is clothed with authority, or constituted an agent, for all, as to all matters

within the scope of the partnership business and dealings. Any restrictions imposed by the partnership articles, operate only *inter se*, and not in transactions with third persons, unless they have knowledge of such restrictions.

5. PARTNERS — IMPLIED AUTHORITY OF EACH TO BIND THE FIRM DEPENDENT ON THE NATURE OF THE PARTNERSHIP BUSINESS. — A partner, unless he is member of a commercial firm or one engaged in general promiscuous trading, has no implied authority to bind his firm by borrowing money and executing promissory notes or other securities, unless the money is necessary for the business, and such pledge of the credit of the firm is usual, as shown by the practice of his firm or others in similar business.

6. PARTNERSHIP LIABILITIES — UNAUTHORIZED ACTS OF A PARTNER — EFFECT OF RATIFICATION BY THE FIRM. — B. gave to R. & M. an agricultural lien on the crop to be raised on Bee Lake plantation, in consideration of money and supplies furnished and to be furnished to complete the crops by them. The lien was in the firm name of B. & D.; but, two days before making the contract, B. had secretly withdrawn from the firm. The supplies and money were furnished from time to time during the year, being sent to the plantation of B. & D., by R. & M., on B.'s order: *Held*, It was the plain duty of *D.* to have notified these merchants that B. had no interest in the crop or business connection with him, and D. was held to have ratified the contract B. had made with R. & M.

7. SUPREME COURT — RULE AS TO REVERSALS OF DECREES FOR MATTERS OF FACT. — In this court, on purely a question of fact, the inquiry is not whether the chancellor was right, but was he clearly wrong. The burden is on the party contesting the decree, to prove that it was founded upon insufficient testimony. If, upon a review of it, it appears that the chancellor may have fairly reached the conclusion he did, we would not be disposed to set aside the decree, although our minds might be inclined to a different result.

APPEAL from the chancery court of Holmes county. CAMPBELL, J.

The facts appear in opinion of the court.

*J. M. Dyer*, for plaintiffs in error.

After Belcher had withdrawn from the firm he could not create obligations binding upon his former partners. Story on Part., § 322 and note; Bank of Port Gibson v. Bougle et al., 9 Smedes & Marsh. 290; Scott v. Tupper, 8 ib. 280. This being not a general trading partnership, but one formed for a specific purpose, farming, Belcher, even if he had not withdrawn, had no right to bind the firm by a contract for money borrowed. Story on Part., § 94; ib. § 202 *a;* 3 Ad. & Ell. 316, 321. The lien was under seal, in the partnership name, but executed and acknowledged by Belcher

alone.   One partner has no implied authority to bind his copartners, by deed.   Collyer on Part. 256, 257; 7 Tenn. 207; Doe *ex dem.* Smith v. Tupper, 4 Smedes & Marsh. 261. As the deed was not stamped it could not be read as evidence to the court.

*W. & J. R. Yerger* and *W. Yerger, Jr.*, for defendants in error.

The stamp acts do not apply to agricultural lien contracts.   The congress of the United States has not constitutional power to prescribe what shall be necessary to render written instruments competent evidence in the state court.   Sayly v. Davis, 22 Wis. 225; Carpenter v. Luelling, 97 Mass. 452; 45 Ill. 29; 48 ib.; 19 Wis. 369; 3 Caldwell, 325; 35 Conn. 239; 4 Curtiss, 415; 6 ib. 251; 8 ib. 171; 5 Wall. 462.   We ask to apply the stamp now, this court having decided that it may be applied at any time.   The proof shows that the transaction of Belcher was substantially ratified by the Davises.   Where the evidence is equally balanced a reversal will not take place.   In cases where the evidence is conflicting, the decree will be affirmed unless manifestly wrong.   The question is not, is it right, but is it clearly wrong?

SIMRALL, J. :

This bill was brought by Richardson & May to enforce an agricultural lien contract under the statute of 1867, against Belcher and J. W. & John B. Davis, who are alleged to be partners in the production of crops on the Bee Lake plantation in the year 1867.   The lien is given on the cotton, to be grown that year, and on mules, etc., for cash and supplies advanced and to be advanced.

Objection was made to the reading of this contract in evidence, because it was not stamped.   Without attempting to enter at large into the discussion of the subject we shall be content to state concisely the grounds of our opinion.

Our complex system of government is composed of states

and a national government ; the constitution of the United States ; the laws of congress made in pursuance thereof, and treaties are paramount and supreme. The powers which have not been delegated by the people, to the federal government, nor prohibited to states, remain to the states and the people thereof. Each is supreme and sovereign within the scope of its jurisdiction. The sovereignty of the states extends to every thing which exists by its own authority, or is introduced by its permission. The powers of the local and national governments are so intimately blended, and come into such close contact, that the limits of the one cannot be defined without prescribing the boundaries of the other. The power of taxation is conferred by the constitution on congress with but a single exception, and but two modifications. The exception is, no tax shall be imposed on exports, direct taxes shall be according to apportionment, and indirect taxes by the rule of uniformity with these restrictions. The grant is in general terms full and plenary. It can hardly be doubted that congress may impose taxes upon all property, in the most extended acceptation of the term, including promissory notes, bills of exchange, and contracts generally. Such has been the practice of the government. In 1794, 1803 and 1813, it passed a stamp act similar, in many respects, to the acts of 1864 and 1866. It may impose a tax on licenses, as to sell wines or spirituous liquors, to deal in merchandise, to practice the professions or conduct other business. And, although the payment is made for the license, it is but a tax on the business. The License Tax Cases, 5 Wall. 470.

But it is necessary to the orderly and efficient administration of the functions of these complex governments, state and national, that each should be independent of the other, within the scope of their operations. Each conducts its affairs by a distinct body of magistracy. Taxation is an incident of sovereignty, and one of its highest attributes. The states may exert it as to all the persons and property within their limits. This power is concurrent then with

both governments, and may be applied, for the most part, to all objects.

There is no authority in the state, in any mode, by any rightful legislation, to incommode or cripple the means and agencies of whatever sort, adopted by congress for the administration of the business and affairs of the general government. This cannot be done either directly or indirectly. It was upon this principle that the tax, imposed by Maryland on the branch of the United States bank, in that state, was declared to be illegal and void. Congress had thought fit to create the bank as a convenient instrumentality in its fiscal operations. If the state would tax its branches it might greatly cripple its efficiency, or drive the branches away altogether. The government can borrow money. In national emergencies it may be absolutely necessary to anticipate resources by a present loan. The credit of the government, and its ability to raise money, would be seriously impaired if the securities upon which it was advanced could be taxed by the states. Therefore, in Weston v. City of Charleston, 2 Pet. 442, it was declared that the states could not tax these stocks and securities. Upon the same principle in Dobbins v. Commissioners of Erie, 16 Pet. 435, it was declared that the states could not tax the saleries of officers in the service of the United States. These decisions go upon the broad principle elaborated by Chief Justice Marshall in McCullough v. State of Maryland, that the government of the United States has special grants of power, with respect to which it is sovereign and supreme; that the states are also sovereign over all the subjects of jurisdiction reserved to them, and that it is fundamental, essential to the harmony of the system, that neither should be hindered, obstructed or interfered with by the other, so long as each moved in its appropriate orbit. This principle, therefore, would rebuke any attempt on the part of the state, by the taxing power, to touch the policy or laws or officers of the federal government. While this is so, the argument is equally cogent, that the general government

should refrain from trenching upon the local policy and laws and functionaries of the states within their limited and appropriate spheres. The same principle which would denounce as void and illegal, every demonstration by the states to encroach upon the jurisdictional domain of the national government, would also discourage and discountenance any and every movement by the latter on the unquestioned right of the former to control and regulate their domestic and internal affairs. Hence, we find the supreme court of the United States giving reciprocity to the principle, by annulling, as illegal and inoperative, that part of the internal revenue laws imposing a tax on the salaries of the state functionaries (state judges was the particular case).

In the License Tax Cases, 5 Wall. 470, the idea is repudiated that congress has any right to interfere in the internal commerce and trade of the states. That subject belongs exclusively to the states. Congress cannot meddle with the business of citizens transacted exclusively in the state, having no connection with the inter state, and foreign commerce. While commerce, foreign and inter state, is committed to the control of congress, so that it may, if it chooses, license parties to engage in it, it cannot license a business, domestic and local, for that would be plainly repugnant to the exclusive power of the state over the subject. Therefore, it was held that the license taxes, under the act of 1864, was not the conference of authority or license, upon payment of the prescribed sum, to carry on the various businesses and occupations ; but was in reality a tax on the business and occupations. The claim that there is power in congress to license a business in the state is rejected and denied. If so, then congress might authorize a dealing in lottery tickets, or in vinous or spirituous liquors by the small, notwithstanding a prohibition of both by the state. The necessary consequence of such a doctrine would be the absorption by congress, of supervision over the police, and interior policy of the states.

These principles are sufficient to dispose of this point.

While the power of taxing the property, occupations and business transactions, including contracts, purely local and domestic, is asserted and sustained, yet, it does not draw with it, as an incident, the right to exceed the taxing power. Congress may punish, as it proposes to do in the acts of 1864 and 1866, for an evasion and failure to pay the tax. It may provide stringent means of collection, by sale and distress. It may constitute the necessary corps of officials to execute the law, and arm them and the federal judiciary with full authority in the premises. Under the power to "levy and collect taxes," all these means may be employed as incidental ; but, under the taxing power, congress cannot intervene in the states, and impose new conditions upon the alienations and conveyances of real estate. It cannot say that a deed, complete and perfect according to the local law, shall not be evidence in the state court, unless it conforms to a requirement not exacted by the state, but prescribed by congress. If the state declares that a promissory note, or bond, or bill of exchange, shall be competent evidence in her courts, on certain conditions, congress cannot prescribe other and additional formula. In the case quoted, congress may tax in the form of prepayment for license to vend lottery tickets in New York ; yet, if New York has prohibited that business, and denounced a penalty, the business is unlawful, and the guilty participant may be punished ; and the license conferred no authority, because that was a subject over which congress had no power. Congress, too, may tax promissory notes or conveyances of lands, and may, by distress and sale, and penal sanctions, guard and insure the revenue. But it cannot make a deed or a promissory note that which it is not so by the local law. Nor can it superadd formalities and terms not demanded by the local law. To hold to the affirmative would be to conduct to the result that congress may repeal or amend state laws, pertaining to subjects purely local and domestic.

But it is never to be presumed that congress meant to

encroach on the authority and jurisdiction of the states. When, therefore, it legislates in reference to the practice of the courts, or the rules of evidence, it must be intended that the law applies only to the courts of the United States. When the state legislates upon the same subjects, and uses the words "all courts," it never has been supposed that the federal courts within the state are included, and, therefore, the language, however broad, will be confined to the local tribunals. Neither the act of 1864 or of 1866, in reference to stamps on contracts and other papers, in terms, embrace the state courts. It is, therefore, the fair and proper reading of the acts, to hold that congress did not contemplate their inclusion. The adjudications in several states on this subject, more or less distinctly, support these views. Fefiela v. Cluse, 22 Ind. 276 ; Jones v. Keep, 19 Wis. 369 ; Latham v. Smith, 45 Ill. 30 ; Express Co. v. Haynes, 48 ib. 249 ; Carpenter v. Snelling, 97 Mass. 452 ; Lynch v. Moore, 98 ib. 458 ; Griffin v. Ranny, 35 Conn. This question has not, as yet, been adjudicated directly by the supreme court of the United States. In Campbell v. Wilcox, decided in that court last year, it was said that the penalty of the statute was leveled at the fraudulent, and not the accidental, omission of a stamp. Such fraudulent omission, if available at all to the maker of the note, can only be set up by special plea, or urged on the trial. The note was read in evidence without a stamp. It was not necessary, in that case, to pass upon the "availability" of the objection, when made by the maker. It may be added, also, that the suit was brought in a circuit court of the United States.

There was no error, therefore, in admitting in evidence this contract because of this objection.

The second question is, whether the transactions between Belcher and Richardson & May, as disclosed by the contract, is binding on the Davises, admitting the partnership. The general principle is, that acts done by one partner in the course of the partnership business, is, in its legal conse-

quences, as if done by all.  As declared in Hawkin v.
Bourne, 8 Mees. & Wels. 710, and by this court in Faler
v. Jordan, 43 Miss., one partner is clothed with authority,
or constituted an agent for all, as to all matters within
the scope of the partnership business and dealings.  Any
restriction imposed by the partnership articles operate
only *inter se*, and not in transactions with third persons,
unless they have knowledge of such restrictions.  Kimbo
v. Bullit et al., 22 How. ( U. S. ) 266.  This principle
applies in full force to commercial and general trading
partnerships.    In those of a more limited character,
the extent of the authority of individual partners must be
measured by the nature of the business in which they
embark.  It has been determined that where two are jointly
interested in a farm, there is not implied authority in either
to draw bills of exchange.  Dickerson v. Valpey, 10 Barn.
& Cres. 138.  Because it is not necessary in carrying on the
farming business.  The same observation is applicable to
some mining partnerships, and others, where bills of
exchange are not necessary and usual for conducting the
business.  Gray v. Ward, 18 Ill. 32 ; Brown v. Byers, 16
Mees. & Wels. 252.  In Dickerson v. Valpey, *supra*, it was
said by Littledale, J., "that it would require more evi-
dence to show an authority to make a promissory note than
to issue a bill of exchange."  That observation was made
with respect to a mining company.  It was laid down, that
the law did not imply an authority, in a single member, to
make either a note or draw a bill of exchange for the con-
cern.  There must be proof, either that it was necessary, or
usual, from the practice of other similar companies.  The
distinction is taken between commercial and general trading
partnerships and those for a more limited purpose.  Gray
v. Ward, *supra*.  The association was "to dig two tunnels
to conduct water for mining purposes.  The money was
borrowed by one member, who gave a note in the partner-
ship name.  The case rested on the implied authority of a
member thus to bind the firm.  It is affirmed that such

implication does not exist except where the authority is necessary to the successful carrying on of the business, or where its exercise is according to the usage and custom of similar partnership enterprises. But, as this copartnership was limited to a single enterprise, a presumption of authority will not be indulged; but it is otherwise in commercial partnerships. These principles are recognized as applicable to a farming partnership in Kimbo v. Bullit et al., *supra.* Indeed, the range of a copartnership, to cultivate a plantation for a single year, is much narrower than one for mining, and it may well be called a "single adventure." The doctrine of the cases, then, resting on sound reason, is, that a partner, unless he is member of a commercial firm, or one engaged in general promiscuous trading, has no *implied* authority to bind his firm by borrowing money and executing promissory notes, mortgages or other securities, unless the money is necessary for the business, and such pledge of the credit of the firm is usual, as shown by the practice of his firm, or others in similar business, which facts must be shown in evidence, in order to sustain the transaction. When Belcher borrowed the money and executed the lien contract in June, 1867, it was incumbent on Richardson & May to know the extent of his authority to bind his copartners. If that was not conferred by the copartnership articles, then it did not exist at all, and there is no liability on the Davises, unless they have subsequently ratified the transaction.

Whether complainants saw the partnership articles at the date of their first advance of money is not disclosed. It appears, however, that subsequently they did have it in possession; had it when this suit was begun, perhaps at the time of the trial. It, however, was not in evidence on the trial. It is, however, in evidence that Belcher should furnish one-half of the means necessary to make the crop, and the Davises the other half. This was one, and likely the most important, stipulation. This negatives the idea that means to make the crop were to be raised by either

party, by a pledge of it, for money and supplies advanced. Each was to contribute, by way of capital, enough to cover half the expenses. Belcher, for himself, was to provide his moiety ; the Davises their moiety. The stipulation is inconsistent with a power in either to pledge the partnership crop for joint advances. Either, however, could pledge his interest in the crop for money, supplies or an engagement on private account.

It is insisted by the Davises, in ·their answer, that the copartnership was dissolved by the withdrawal of Belcher before the contract was made with Richardson & May. It seems that in April, 1867, Belcher and the Davises were in treaty with Gen. Miles for the lease of the Bee Lake plantation, and, in view of the consummation of the leasing, the parties agreed to cultivate it together on the terms of Belcher furnishing one-half the means and the Davises the other. The lease was reduced to writing and signed on the 8th of June. It was quite certain that on that day the partnership had been dissolved, for Belcher, who was present, signed the lease as "surety." The explanation given of the dissolution by J. B. Davis, in his deposition, is that Belcher was unable to provide the means to fulfill his part of the contract, and for that reason he withdrew. The answer of Davis fixes the time of the withdrawal as on or about the 8th of June. In his deposition, J. B. Davis fixes the time at about the 1st June. So does Green, the manager on the place. J. W. Davis fixes the same time, and states, in addition, that the distinct arrangement was, that Belcher had no authority to pledge any thing except his separate interests, and that he made effort to do so and failed, and thereupon retired from the business. Belcher's deposition is exceedingly unsatisfactory. He gives no satisfactory account of the funds received from Richardson, and thinks the partnership was not dissolved legally, and that he had some interest in the crop.

The testimony quite conclusively proves that the dissolution occurred between the first and the eighth of June,

most probably before the fifth, the date of the contract with Richardson. If Belcher disconnected himself from the Davises on the eight, two days after he borrowed the money, the utmost that can be said of it is, that his contract with Richardson mortgaged all the cotton that he might have an interest in, to be made on the Bee Lake plantation.

On the first examination of the record, our attention was more especially directed to the question of the power of Belcher, either by implication or the articles of copartnership, to bind the Davises, and we failed to give full consideration to the evidence of ratification by them. The contract of Belcher with Richardson & May purported to create a lien on the entire crop, etc. The parties with whom he was dealing were bound to know the extent of his authority, that, as we have seen, extended only to half the crops, etc. The ratification could only extend to a confirmation of a pledge of half the crop, or such interest in it as he would be entitled to by the copartnership agreement. On the receipt of supplies sent to the plantation by Richardson & May, on Belcher's order, during the year, it was the plain duty of Davis to have notified these merchants that Belcher had no interest in the crop, or business connection with them. There is testimony tending to show that Davis had notice that Belcher had an account with the complainants, for when presented to him by their agent, he expressed surprise at the amount, and promised to ship cotton to provide for its payment. If we were sitting as the court of original jurisdiction, we might, in all the circumstances of the case, come to the conclusion that there had not been a sufficient ratification to bind the Davises. In this court, however, on purely a question of fact, the inquiry is not, whether the chancellor was right, but was he wrong, clearly wrong. The burden is on the party contesting the decree, to prove that it was founded upon insufficient testimony. If upon a review of it, it appears that the chancellor may have fairly reached the conclusion he did, he would not be dis-

posed to set aside the decree, although our minds might be inclined to a different result.

There was testimony to the point that the defendants were cognizant that Belcher had dealings with the complainants, on the predicate of his being a partner with them, and that they failed to advise them to the contrary, and further, that they recognized their obligations to pay the claim, inasmuch as they realized the entire crop.

Upon the whole we affirm the decree.