Day, Chief Judge.
The exceptions taken by each party in the court below, and their respective petitions in error, •bring in review all the material points in the original case.
The actiou was brought for the enforcement of mortgage liens. The first questions to be considered relate to the validity of the mortgages. They are claimed to be void chiefly on two grounds: 1. By reason of their defective execution under the revenue laws of the United States. 2. That they were made to defraud the creditors of the mortgagor.
It becomes necessary to consider the first objection in its effect as between the parties to the mortgages, and its effect in relation to third persons.
The mortgages were given to secure the payment of a •note for $100,000. The note was stamped when it was made, with a revenue stamp of $50. The note was made in New York, on the 6th of June, 1866. The mortgages were executed in Cincinnati, on the following 22d day of •June, and were forwarded to New York without being stamped.
The stamp of $50 was all the law required for the validity of the note alone. But, as to the mortgages, the revenue laws of the United States required an additional stamp *522 of $50 on the note, or that they should, be separately stamped in a sum of twice that amount.
Without reciting the testimony, we deem it sufficient to say that the evidence convinces us that the parties in — ' tended to stamp the note when it was made, with a stamp of the amount required by law for the validity of both the note and the mortgages made for its security, and that the failure to do so, was through the mere misapprehension or inadvertence of the attorney under whose supervision the business whs transacted.
Neither party had any intention of evading the revenue-laws of the United States. The act then in force invalidated instruments which were required to be stamped, only when the stamp was omitted “ with intent to evade the provisions of the act.” Harper v. Clark, 17 Ohio St. 190; Campbell v. Wilcox, 10 Wall. 421.
Moreover, the attorney of the mortgagees, who had the-custody and control of the note and mortgages, after the-mistake in relation to the stamp was discovered, applied to-the collector of the district where the note was executed, and made such a showing before him, that, in accordance-with the provision of the revenue act, that officer affixed in due form an additional stamp of $50 to the note. The act of July 13, 1866, then in force, provides that the instrument so stamped “ shall thereupon be deemed and held to be as-valid, to all intents and purposes, as if stamped when made or issued.” 14 U. S. Stat. at Large, 143.
The amount of revenue stamps on the note, when so-stamped, was equal to that required by law for mortgages-of the amount of the note; and section 160 of the act, enacts that “ whenever any bond or note shall be secured by mortgage, but one stamp shall be required to be placed on such papers; provided, that the stamp duty placed thereon shall be the highest rate required for said instruments, or either of them.” 13 U.-S. Stat. at Large, 294.
Eor both these reasons, then, the mortgages can not be invalidated for want of compliance with the revenue laws; of the United States.
*523 But it is claimed that under the state statute, an unrecorded mortgage is of no validity whatever. This must be denied. It does not take effect as to third persons until it is left for record; but, as between the parties to the mortgage, it is effective whether it be left for record or not.
It is also claimed that since a mortgage does not take effect until it is recorded, and that inasmuch as the revenue laws of the United States declare that the record ot any unstamped instrument which is required to be stamped shall be void, the record of the mortgages in question before they were duly stamped, was void as against the assignees in bankruptcy of the mortgagor.
The mortgages were recorded in accordance with the statutes of the state, January 2, 1868. The rights of the assignees to the mortgage premises attached on the 29th day of February following, when the petition was filed on which the mortgagor was adjudged a bankrupt.
The mortgages, then, being in fact recorded before the rights of the assignees attached, so far as regards the law of the state, were existing liens prior to that of the assignees, and valid as against them.
"Was the legal effect of the record under the laws of the state impaired by reason of the mortgages being insufficiently stamped when they were recorded ?
The internal revenue act then in force declared that the record of any unstamped instrument, required by law to be stamped, should be utterly void, and should not be used in evidence. U. S. Stat. 1866,14 Stat. at Large, 141.
"We have already shown that the plaintiffs availed themselves of the remedial provisions of the act, by having the note sufficiently stamped, to validate the mortgages.
The act also contained a provision for validating the record of unstamped instruments. It declares that when the original instrument has been duly stamped, a new record, or a note of the correction on the original record, may be made, and that thereupon the “ original instrument, or a record thereof, may be used in all courts and places in the *524 •same manner and with, like effect as if the instrument had been originally stamped.”
The record of the case before us does not contain a copy of the mortgages, nor a copy of their record; and the evidence in regard to the correction of the record of the mortgages in compliance with the revenue act, is indefinite; but enough appears to render it quite probable that the remedial provisions of the act in regard to the record were fully complied with by the plaintiffs. Nor is it claimed to the contrary by the assignees. But they claim that the correction of the mistake or neglect in regard to the stamps on the note did not take place until after the 29th day of February, 1868, when their rights attached.
It perhaps might be a sufficient answer to this claim to .say that the record of the case before us does not show when the correction was made.
But a copy of the note presented in argument shows that the stamp placed on the note by the revenue collector was -canceled in May, 1868, after the petition in bankruptcy was filed.
But if this fact appeared in the record before us, it may be doubted whether it would be of any avail to the assignees ; for, however the case may stand, upon the facts of the case, under the remedial provisions of the revenue act, the important inquiry arises as to whether the act, so far as it invalidates records of unstamped instruments, applies to the case before us.
The determination of this question depends upon the construction to be given to sections 152 and 163 of the act, as amended by the 9th section of the act of 1866, which is the only part of the act necessary to be considered.
Section 152 declares “ that it shall not be lawful to record any instrument,” required by law to be stamped, unless it is duly stamped, and that “ the record of any such instrument,” not stamped, “ shall be utterly void, and shall not be used in evidence.”
Section 163 declares that no instrument, required by law to be stamped, which is not sufficiently stamped, “ shall be *525 recorded, or admitted, or used as evidence in any court,” until stamped as required by law.
Without denying that it is within the power of taxation conferred upon Congress, to levy, taxes and collect them by means of stamps placed on written instruments, and to enforce the observance of the law by the imposition of penalties ; yet the power of Congress to prescribe as a penalty that which invades the rules of evidence in the state courts, has been denied by the highest courts of many of the-states, and in others so gravely doubted that at the present time it may be regarded as settled by the decided weight of authority that, whether the disputed power exists or not, since the act does not in express terms apply to the courts of the several states, and the provision excluding unstamped instruments from being giving in evidence can have full application and effect by confining it to the federal courts, its application must be regarded as limited to* the courts over which Congress has legislative control. Carpenter v. Snelling, 97 Mass. 452; Green v. Holway, 101 Mass. 243 ; People v. Gates, 43 N. Y. 40 ; Clements v. Conrad, 19 Mich. 170 ; Craig v. Dimock, 47 Ill. 308 ; Bunker v. Green, 48 Ill. 243 ; Wallace v. Cravens, 34 Ind. 534 ; Griffen v. Ranney, 35 Conn. 239; Duffy v. Hobson, 40 Cal. 240; Bumpass v. Taggart, 26 Ark. 398; Davis v. Richardson, 45 Miss. 499 ; Dailey v. Cocker, 33 Texas, 815.
The same sections of the act, which prohibit unstamped instruments and documents from being used in evidence, forbid the recording of such instruments. For the same-reason, therefore, that the clauses prescribing a rule of evidence must be regarded as applicable to the federal courts only, those relating to the recording of instruments not stamped as required by law, must be held to apply to such instrumeants as are required to be recorded by federal legislation and to officers under federal control.
If,'then, the inhibition of the act extends only to federal officers and to instruments required by federal law to be^ recorded, the penalty invalidating the record of unstamped.. *526 Instruments can have no further extent, for it is the record of only “such instrument” that is declared to be void.
Nor is this construction of the act unsustained by authority. In Moore v. Quirk, 105 Mass. 49, the Supreme Court of Massachusetts held that the provision of the act in question does not affect a record under state laws. The opinion of the court is briefly stated as follows: “ The ■clause of the internal revenue act which provides that instruments not stamped as therein required shall not be recorded, can not be construed as prohibiting the performance by the officers of the commonwealth of the duties imposed upon them by its statutes, but must be limited in Interpretation and effect to records required or authorized by acts of Congress, for the same reasons upon which the prohibition in the same clause against giving unstamped instruments in evidence in any court has been decided to be applicable to the federal courts only, and not to extend ■to the state courts.” To the same effect is the case of Moore v. Moore, 47 N. Y. 467.
Concurring in this view of the act, a majority of the court .are constrained to hold that the revenue act did not invalidate the record of the mortgages in question.
The assignees further contend that the mortgages were void under the provisions of the 35th section of the bankrupt act, for the reason that they were not recorded until within four months before the petition in bankruptcy was filed. But that section declares only such conveyances to be void as are made by the bankrupt within that period as ■a preference. He made and delivered the mortgages to the plaintiffs more than a year before the petition in bankruptcy was filed, and before the insolvency of the mortgagor existed or was anticipated. Without being recorded, they were valid securities in the hands of the plaintiffs. The mortgagor, on delivery of the mortgages, had done all 'in his power to do, to transfer the title to the mortgagees. As against him, the mortgages were operative from their date. If the mortgagees were satisfied with the security .afforded by the mortgages unrecorded, there was no neces *527 :sity for recording them. The record was only necessary to .give them effect against those not parties thereto. It was not for the bankrupt, but for the creditors secured, to determine whether they should be recorded or not. The delivery of them for record was in no sense his act, but it was theirs alone. “ The preference which the law condemns is a preference made within the limited time by the bankrupt, and uot a priority lawfully gained by a creditor; and the preference gained by the record was not a preference made by the bankrupt.” Bump. 9 ed. 800 ; In re Wynne, Chase’s Decisions, 227 ; Folsom v. Clemence, 111 Mass. 273; Seaver v. Spink, 65 Ill. 441; Sawyer v. Turpin, 1 Otto, 114. If, then, the mortgages were otherwise unobjectionable, and not withheld from record for a fraudulent purpose, they were not invalidated by the mere fact that they were recorded within the time limited in the 35th section of the bankrupt act, before the filing of the petition in bankruptcy.
"We are thus brought to consider the question whether the mortgages were void on the ground that they were made to defraud the creditors of the mortgagor.
L. C. Hopkins, the mortgagor, was the controlling member of a mercantile firm doing an extensive wholesale and retail business in the city of Cincinnati; and the mortgagees were wholesale merchants in the city of New York. The firm consisted of A. T. Stewart and William Libbey, with two others who attended to the business of the firm in foreign countries. Mr. Libbey had the principal management of the business in New York, and Mr. Stewart had the general supervision and control of all the business, of the firm both at home and abroad.
Hopkins & Co. had for a number of years been heavy purchasers of Stewart & Co., and had a large line of credit with their house. By arrangement between the two firms, Stewart & Co. kept a cash account with Hopkins & Co. •separate from the merchandise account of the two firms.
Early in the season of 1866, Hopkins & Co. made arrangements to greatly enlarge their business facilities in Cincinnati, and to raise the necessary capital for the increased *528 trade contemplated, Mr. Hopkins applied to Mr. Stewart for 3 personal loan of $100,000.
The relations between them had long been of a friendly-character, and Mr. Stewart seems to have had unbounded' confidence in the business ability and integrity of Mr. Hopkins. After stating what had been done to enlarge his business, Mr. Hopkins represented that he had a large surplus in the firm of Hopkins & Co.; but that for the purpose of further enlarging the business of the house, he desired to sell a portion of the real estate owned by him, which he represented to be worth over $200,000, but could .not be-immediately converted into cash. This real estate he proposed to mortgage to secure the loan, and for the same purpose to assign his life policies, amounting to $60,000. Eor aught that appears, the representations of Mr. Hopkins in regard to his pecuniary circumstances were in accordance'with the truth at that time. •
Mr. Stewart accepted the proposition of Mr. Hopkins, and gave him a check on a city bank for $100,000, and took his note for that amount to Stewart & Co. But as Mr. Hopkins had neither a description of the land, nor the life policies with him at New York where the business was-done, the execution of the mortgages and assignment of the policies were intrusted to him to be done after his return to Cincinnati.
Accordingly,' oh June 22, 1866, Hopkins executed the mortgages and the assignment of the policies to Mr. Stewart, and forwarded them to New York. The mortgages, ten in number, were made on as many separate parcels of property, for convenience of sale to pay the note.
Mr. Hopkins says he requested, when he negotiated the-loan, that the mortgages should be withheld from record,, and that they should be respectively returned as the parcels of land were sold, and the proceeds applied in payment of the note: He says no reply was made to this request. But’ it is denied by Mr. Stewart, and Judge Hilton, his legal adviser, who were the only persons present when the business was transacted, that any such request was made. They *529 testify that no arrangement whatever was made riot to have the mortgages recorded. When the mortgages were received in New York, they were placed in a trunk, containing Mr. Stewart’s valuable papers, which was in the sole charge of Judge Ilil'ton. The judge being absent when they were received, they remained a long time without particular notice and remained unrecorded, for which neglect he says he was blamable.
The check given for the note was soon after handed to Stewart & Co. and by them placed to the credit of Hopkins & Co. as so much money received of them. He checked it out again, as he did all moneys credited in the cash account of the parties, in payment to Stewart & Co. and other'merchants for merchandise in his business..
Hopkins & Co. continued apparently to prosper in business, and had an unlimited credit with Stewart & Co., for more than a year after the loan was made; and within that time Mr. Hopkins paid $25,000 on the note. But the financial revulsion that took place in the summer of 1867 found him with a large stock of goods on hand, and the great fall of prices on sales brought him to the bankruptcy that followed in the ensuing winter. When, however, the loan and mortgages wei-e made, Hopkins was solvent, and none of the parties contemplated the reverses that followed. All their subsequent transactions show that the confidence of Stewart & Co. in the solvency and integrity of Mr. Hopkins continued until about the time of his failure.
The evidence does not establish — it rather rebuts any fraudulent intent in making the mortgages. The strongest circumstance to the contrary was the long delay in delivering them for record; but that seems to have been an inadvertence, not unlike that of the failure to sufficiently stamp the note, resulting in part from a confident belief that they would be soon paid from the sales of real estate, and that no necessity would arise requiring their record.
We are not justified in finding that there was an agreement to keep the mortgages from record. But had that *530 been the ease, it would not of itself have rendered the mortgages void, though it would have been a matter for consideration, in connection with other facts, in determining the question of the alleged fraud. Sawyer v. Turpin, 1 Otto, 114; Folsom v. Clemence, 111 Mass. 273.
The object in making the mortgages was not to hinder or delay creditors, nor to procure false credit; but was to secure a loan of money made in good faith to pay debts and buy increased quantities of goods for the enlargement of a supposed prosperous business. The money was so applied. It was regarded as an effort to convert real estate into money, to be represented in an equal amount of property invested in merchandise, which was supposed to be no less advantageous to creditors by a change of the form in which the property consisted. The transaction, as regarded at that time, was not so much to procure an increase of credit as it was to obtain, an advance on property then designed to be added to the assets of the mercantile firm; but subsequent events, in part those that affected generally the business of the country, resulted in disappointment to all concerned.
The mortgages being regarded as valid and effective against the assignees, their claim to recover the amount of .$25,000 paid and credited on the mortage note, May 4,' 1867, nearly ten months before the petition in bankruptcy was filed, becomes groundless. But they claim the right to recover of the plaintiffs $85,025.50 paid ou the note within four months before the petition was filed. Ou the other hand, the plaintiffs claim that the payments constituting that sum should not be applied on the note, but should be credited ou their account against Hopkins & Co. for merchandise.
This amount was forwarded by Hopkins from Cincinnati to New York, in four installments, and each remittance was accompanied by his written instructions for its application on the note.
In regard to the remittances of $10,000, Nov. 12,1867, and of $17,000, Dec. 23, 1867, the court below found, as *531 matter of fact, that the plaintiffs consented to their application on the note in accordance with, the instructions of Mr. Hopkins. The testimony will not warrant us to controvert that finding. As between the parties to the note, these remittances must, then, be regarded as payments on it at their respective dates, which were less than four months before the proceedings in bankruptcy were begun.
The assignees have no claim to the amount of these payments, other than what they can assert under the 35th section of the bankrupt law, as being payments made by an insolvent debtor in preference of a creditor having reasonable cause to believe him to be insolvent.
It is quite apparent from the evidence that these payments were not made by Hopkins with a view to give a preference to the plaintiffs ; but were made for the purpose of relieving his real estate from what was regarded by him, and was in fact, a valid mortgage incumbrance, so that it might be more available both to himself and his creditors. Nor is it at all clear that the plaintiffs, when these two payments were made, believed or had reasonable cause to believe that Hopkins was insolvent. But the assignees can not recover under that section, without establishing, both the intent of the debtor to give a preference, and that the creditor had reasonable ground to believe him to be then insolvent. Mays v. Fritton, 20 Wall. 414; Clark v. Iselin, 21 Wall. 360; Little v. Alexander, Ib. 500.
But the payment of a mortgage debt, where the mortgage, as in this case, is full security for the debt, is not a preference within the meaning of the bankrupt act. For (as Lord Denman reasoned in Marshall v. Lamb, 5 Ad. & Ell. N. S. 115,) the assignees have the mortgaged property, “ and it is indifferent to them whether they have the property free from the mortgage, (supposing it to exceed in value the amount of the mortgage,) or the property subject to the mortgage and the amount of the mortgage money in cash.” It does not diminish the bankrupt’s estate available for the payment of his other debts. The payment merely relieves the mortgaged premises of the same *532 amount which would otherwise have to be made out of the land for the same purpose by the assignees. It has been repeatedly held by the Supreme Court of the United States that an exchange of property or securities which do not diminish the bankrupt’s estate, is not a preference under the bankrupt act. Cook v. Tullis, 18 Wall. 332 ; Burnhisel v. Firman, 22 Wall. 170. In Sawyer v. Turpin, 1 Otto, 114, it was held that the substitution of a mortgage, within four months before the filing of the petition in bankruptcy, for an unrecorded mortgage taken more than four months before, is not a forbidden preference under the act where the new mortgage is recorded before the petition is filed, and the mortgage taken up is of equal value to that substituted for it. And in Clark v. Iselin, 21 Wall. 360, it was held that the payment of a judgment, which was not a forbidden preference, to relieve personal property of an equal or greater amount from the levy of an execution was not a preference under the act. The principle settled in these cases is decisive against the right of the assignees to recover the amount of the two payments in question.
The remittances of $10,000, Dec. 28,1867, and $48,025.50, Dec. 30, 1867, being the balance due on the note, Stewart & Co. declined to credit thereon, as directed by the letter of Hopkins accompanying each remittance. Neither did. they at that time credit these remittances on either the cash or merchandise account of Hopkins & Co.; but held them subject to the further order of Hopkins.
The plaintiffs contend that they had the right to refuse the application of these remittances on the note, as requested, and claim that they are entitled to have them credited on the merchandise account of Hopkins & Co. The ground of this claim is that Hopkins & Co. purchased goods of them under such special agreement that Hopkins had no right to divert the proceeds of their sales to the payment of the note-; and that his attempt to do so authorized them to hold the money subject to his further order, and his bankruptcy having intervened, the law will set off the same against the account due them for goods.
*533 On the other hand, the assignees seek a recovery of the money on the ground that Hopkins owned it when their rights accrued; or, if not, that it must be regarded as a payment forbidden by section 35 of the bankrupt law.
The agreement relied upon by the plaintiffs is based chiefly on the testimony of Air. Libbey, one of the plaintiffs. He testified that from August, 1867, the purchases by Hopkins & Co. of their house consisted largely of what are denominated “ cash goods, such as prints, bleached and brown goods, muslins, etc. — goods sold usually by parties at cost price as an inducement for trade, and are necessary for a jobber to have on baud to keep his trade alive.” . . . “The amount the firm was owing us at that time being large, and payments not being promptly provided for, it called for an interview-with Hopkins and Turner, both of them, at different times, to insist upon payments being made as fast as their bills matured — at the same time they were making large purchases of us, principally of cash goods. They both of them promised us that remittances should come forward immediately, not only to pay up their past-due account, but to fully cover the purchases then being made by them. As an illustration, they were, during the month of September, purchasing between thirty and forty thousand dollars’ worth of goodsthese goods we declined to deliver. Mr. Turner at that time stated that Mr. Hopkins had requested him to say that any purchases that he made of-us at that time, during his visit to New York, should be promptly remitted for, and that they wanted a statement of our account, so that they would know about what amount was due by them, and the amount of new purchases being made, so that they could remit us the amount to cover. They positively promised to remit us the proceeds of the sales of these goods, then being purchased, in connection with larger amounts which these goods would enable them to realize from the sale of fancy and other goods, which their stock largely consisted of.”
He states that during the autumn months of 1867, Hopkins & Co.’s purchases of cash goods of Stewart & Co. were *534 “in the neighborhood of $105,000;” and further says: “ They promised to remit us their entire receipts ; that they had no payments to make apart from us and in connection with their notes maturing and being paid by us ; that then-sales, from the accommodation which we were rendering them,'in connection with the deliveries of cash goods, would be very large, and they would very soon be able to square up their accounts with us, and make everything satisfactory to us by their remittances.
“ During this period he discounted some of his own paper held by other parties, and drew upon us for the amount, and we paid Ins drafts. During this period, also, we purchased for his account, in the market, cash goods, which were delivered to him and the bills paid by us; that is, the purchases were made by him and accepted by us, the parties declining to deliver to him — the reason we did not know, but we presume his line of credit with these parties was full. ¥e so understood.” . . .
“ I understood from Messrs. Hopkins & Turner that then-gen oral stock of goods, apart from what are termed cash articles, was very large, and that it was indispensable to them to have a quantity of these cash goods to work off this heavy stock of other merchandise.
“ From my knowledge of business, I knew this was a fact, and I knew that it was indispensable for them to have such goods, arid relying implicitly on their integrity and ability to pay, they were delivered.”
Mr. Turner testified that he never told Mr. Libbey that Mr. Hopkins would remit the proceeds of any specific goods; and, speaking of the transaction in September, 1867, said : “ I told him this : That Mr. Hopkins had requested me to say that he would remit for that lot of goods that I bought at that time ; they were domestic goods, sheetings and prints; that if he would send the goods, he would remit the money forthwith ; and on those conditions he let me have the goods.”
In regard to the same matter, the testimony of Mr. Hopkins is as follows :
*535 “ Q. I want to call your attention to a statement made by Mr. Libbey, which you may have heard in the reading of his deposition : Did you or not, at any time, state to him, or any other of the plaintiff's, that you would appropriate the proceeds of the sale of any particular articles of personal or real property to the payment of any purchases of cash goods or time goods made in the year 1867 ?
“A. I did not make the statement in that shape. I sent word to Mr. Libbey, through -my agent, Mr. Turner, who was acting as my agent, that I would remit the amount'to him, not the proceeds of any particular articles. I did not xsay I would remit the proceeds of these identical goods, but that I would remit the amount of those goods.
“Q. That is what I wanted to get at, whether it was to make remittances in payment, or undertaking to remit the proceeds of any particular articles ?
“A. Not the proceeds of any particular articles, but I did promise him I would send the payment right along for those goods — cash goods.”
It is claimed in behalf of the plaintiff's, that the delivery of the cash goods to Hopkins & Co., under the agreement shown by this testimony, gave them a right to the proceeds of their sale in the nature of a trust; or, at all events, that the agreement was of such a character as to give the plaintiffs the right to decline to apply any money arising from the sales of merchandise by Hopkins & Go. on the note before their account to the pDlaintiffs was fully paid.
But we think the testimony in question, carefully scrutinized and read in the light of the remaining evidence, does not establish an agreement of the character and effect claimed by the plaintiffs, nor did the parties so understand it by the transactions referred to.
It is not claimed that any fraud was resorted to in obtaining any of the goods. The title to the cash goods passed as fully to the purchasers as did that of any goods bought of the plaintiffs by Hopkins & Co. At most, the plaintiffs, by reason of the large purchases of this kind of goods by Hopkins & Co., and of their delays in payment of other *536 goods, exacted renewed assurances of prompt payment, otherwise they would have refused so large a line of credit on this class of goods.
Moreover, the promised remittances related as much to the proceeds of the sale of all other goods as to the avails of the cash goods; and related equally to goods then on hand and those purchased of other parties. No trust was understood to attach to the sale of the cash goods then bought more than to that of any other goods, to which there is no pretense of any special trust.
The reinittanees contemplated were only in continuance of what had long been the course of business between the parties. Nothing new was contemplated. Eor a number of years previous, Hopkins & Co. had kept their cash account in New York with the plaintiffs. The avails of their large business had long been remitted to the plaintiffs, and all their Eastern accounts paid by checks on them. No new relation between the parties was created, nor any different mode of payment for goods purchased established. More emphatic promises of prompt payment were exacted. That was all. Nothing more was needed in the estimation of the plaintiffs, for they seem to have had no doubt of the solvency of Hopkins & Co. Indeed, the whole substance of the transaction is. expressed by Mr. Libbey, when he said, speaking of it in relation to these goods, that, “ relying implicitly on their integrity and ability to pay, they were delivered.” This was the whole foundation of the credit given. No other security, either upon the goods or flieir avails, was secured or contemplated. The facts of the case, then, will not warrant us in attaching a special trust to the goods or their proceeds. Neither is it shown -that the money in dispute arose from the sale of the cash goods, nor from what source it came.
Not only did the relations of the parties remain the same, after the transactions in question, as they were before, but they did not differ essentially from those sustained by Hopkins & Co., as to the character of credit given to them for goods, toward other merchants; for when they *537 failed, they were indebted to other creditors ’more than half a million of dollars, who, like the plaintiffs, had trusted them for goods, “ relying implicitly on their integrity and ability to pay,” and their assurances of prompt payment.
This view of the case is fully sustained by the dealings of the parties after the conversations spoken of by Mr. Libbey; indeed, they can iiot be reconciled upon any other theory, and are inconsistent with that now advanced by the plaiutiffs. Eor Hopkins & Co. continued to remit the avails of their sales to the plaintiffs, and the plaintiffs continued to pay their checks in favor of other parties as they had ever done ; and they continued to credit payments on their merchandise account, or on the note as directed by Hopkins, as they had always done before, and this they did up to the time of his failure. Not until he had suspended business, late in December, 1867, did the plaintiffs ever claim an arrangement by which they had any special rights in the premises; yet, in the meantime, during the transactions referred to, from the first of September to the time of Hopkins’ failure, his firm had remitted to the plaintiffs more than sufficient to fully pay them all their demands. "Without including the money in controversy, and that credited on the note, Hopkins & Co. remitted to .the plaintiffs after the first of September, 1867, over $435,000; and, within the same period, the plaintiffs paid the checks of Hopkins & Co. in favor of other merchants to the amount of nearly $320,000 ; leaving in their hands an amount greater than that of all the cash, goods sold by the plaintiffs to Hopkins & Co. during the period in question, though it is noticeable that this large amount was paid by the plaiutiffs while Hopkins was owing them an amount nearly equal to the full amount so . paid.
The acts of the plaintiffs after the supposed arrangement were consistent only with the idea that then, as ever before, they were dealing with Hopkins & Co., “ relying implicitly on their integrity and ability to pay,” and are inconsistent with the existence of any special agreement changing the relations and legal rights of the parties. No such supposi *538 tion appears to have been entertained by the plaintiffs until their implicit confidence in Hopkins was shattered by his unexpected suspension in business, by selling out his stock of goods, which occurred the day before he remitted the first installment of the $58,025.50 now in question. The plaintiffs then, it would seem, for the first time, became alarmed, and Mr. Libbey hastened to Cincinnati, put the mortgages on record, and then informed Hopldns that these remittances would not be credited on the note, but would be passed to his credit on his merchandise account, to which Hopkins objected, and there the matter was left until the rights of the assignees attached.
It was the failure of Hopkins that first brought the plaintiffs to a realizing sense that they were the victims of misplaced confidence, and of the necessity of applying all funds in their hands to the satisfaction of their unsecured claims ; for they continued to pay Hopkins & Co.’s checks in favor of other parties in large sums up to the time that Hopkins sold out and went out of the mercantile business, and to that time continued to apply moneys checked or paid to them upon their account^or on the note as Hopkins might direct.
It is quite clear that neither of the parties supposed that they had made any agreement that bound Mr. Hopkins to pay the account of Hopkins & Co. before he might pay his individual note. Nor did Mr. Libbey, when he refused to apply the last two payments on the note as directed, make any pretense that there was a special agreement authorizing it. The subsequent correspondence, in relation to the matter, clearly shows that there was none; and leaves little doubt that the idea of any agreement of the kind, which is supposed to have had its birth during the autumn of 1867, was not, in fact, conceived until the following year. It also shows that the legal advisers of the plaintiffs in New York found nothing in the case creating any relation between the parties, other than that ordinarily existing between 'debtor and creditor.
Under this state of fact, a majority of the court hold that *539 no agreement existed between the parties, which, takes the case out of the ordinary rules of law controlling the application of money paid to a creditor who holds two claims against the debtor making the payment, where no special facts exist controlling its application.
In the present case, no objection was made by the creditor to receiving the two remittances in dispute in payment of the note, on the ground that they came in separate installments, neither of which paid the note in full. Nor, indeed, could such an objection be of any avail; for each ■was made with the same direction by the debtor; both were retained by the creditor; and, in the aggregate, they amounted to the full sum due on the note:
The full amount was paid for a specific purpose, designated by the debtor -when made — to be upon, and in satisfaction of, the mortgage note. In such a case the creditor has no right to retain the money and divert it to another purpose, unless it be by virtue of a contract depriving the debtor of the right to make his election as to the application to be made of payments of his own money. Mere equities, that would be available to the creditor in case the debtor fails to direct the application of a.payment, will not be sufficient. The minds, of the parties must meet, upon some valuable consideration, in understanding that the debtor is debarred from making the application designated by him. No such contract, we have seen, existed in this case. Goods were not obtained by the debtor upon the promise that an account should be paid before the note. Neither party so understood it, nor did they act upon any such understanding; though, as events transpired, it would have been advantageous to the plaintiffs, however hard it may have been for Hopkins, or his other creditors, who have claims to his assets equally equitable, and against whom such an advantage ought to be obtained only upon the existence of a clear right thereto.
Whatever, then, may be the law where the debtor, owing several debts to the same creditor, fails to direct the application of a payment when made, and the application is not *540 controlled by a binding agreement, it is indisputably settled that he “ has the power to make the application at the time, of payment, which he may do either by express words, or a conduct indicative of his intention.” Smith’s Mer. Law, 670.
This doctrine has never been controverted in this state. Oh the contrary, in Gaston v. Barney, 11 Ohio St. 506, it was expressly held to be so well settled as not to require the citation of authorities, that “where one person is indebted to another on various accounts, he has an undoubted right to choose which debt he will pay first;” and that where partial payments are accepted by the creditor without objection, he is bound “to make the appropriation of the payment, which the debtor, at the time of parting with his money or effects, may have directed.”
The plaintiffs, though they kept the money, declined to make the application directed by Hopkins when he made the payment. They were neither authorized to credit it on their cash account, nor to apply it otherwise than as directed by the payer. Equity will regard that as done which ought to be done. The court below, therefore,, might well have applied it in satisfaction of the note and mortgages. This the court did not do; but it permitted the plaintiffs to recover the same amount out of the mortgage securities, which are abundantly good for that sum, and gave the assignees the money. The practical effect of the judgment is the same as it would have been had the money been applied in satisfaction of the note and mortgages; for it can make no substantial difference to the plaintiffs whether the money be applied in satisfaction of the mortgages, or be given up, and recovered again on the mortgages. In either case they obtain the same sum in discharge of the mortgage debt. Nor does it make any difference with the estate of the bankrupt, whether the money be, in the first instance, applied to relieve the mortgaged premises from incumbrance, or it be given to the assignees, who must make the same application of it. In the end it results the same, practically, as if the court below had applied the money, as *541 it ought to have done, in satisfaction of the note and mortgages. Neither party, therefore, is substantially prejudiced by the judgment below. There is, then, no necessity for its reversal on the ground of a misapplication of the money; and, there being no other error, the judgment might well be affirmed on this ground alone.
But the same result may be arrived at upon another, though (for myself I may be permitted to say) less satisfactarv, ground.
The money was remitted to the plaintiffs for a specific purpose. It was not intended the title thereto should pass to' them for another purpose. The plaintiffs were not, therefore, authorized, by crediting it on account, to convert it into a mere debt. Nor was it money remitted to be used, or held in trust, in any manner to result in a debt of the plaintiffs to Hopkins or Hopkins & Co. Strictly speaking, then, it could not be classed as among the “ mutual debts or mutual credits between the parties,” authorized by the twentieth section of the bankrupt law, to be set-off against each other; for that section was not intended to change or enlarge the law of set-off" beyond what the principles of legal or equitable set-off previously authorized. Sawyer v. Hoag, 17 Wall. 610. Ordinarily that does not become a debt w'hich was not intended as such, nor a credit that was not in the contemplation of the parties to become a credit in the nature of a debt. Waterman on Set-off, secs. 148 aud 153.
In this condition the money was held when the rights of the assignees attached. They succeeded not only to all the rights of Hopkins, but were further endued by law with power to disregard all payments made by him, by way of preference, within four months before their rights attached. The payments made by Hopkins to the plaintiffs were within that period. It is true he did not make them with a view to a forbidden preference, but to allow the plaintiffs to apply" the money as they seek to do, would be permitting them, with full knowledge of Hopkins’ insolvency, to do what the law' prohibits both him and them from doing. *542 This would be a preference as clearly in violation of the spirit of the 35th section of the bankrupt law as a voluntary preference made by the bankrupt himself would be. It would equally defeat, the purpose of the law, which is an equal distribution of the bankrupt’s estate among his creditors.
Having no right to appropriate the money otherwise than in payment of the note, when the rights of the assignees attached, but being held by the plaintiffs without such application, the court did not err to their prejudice in adjudging the money to be paid to the assignees, and in leaving 'them to their remedy on their unsatisfied mortgages.
It follows that the judgment of the superior court must be affirmed.
Johnson, J., concurs with the majority in affirming the judgment, though notin some of the reasons given therefor.