THE PEOPLE on the relation of SARAH ANN BARBOUR,
    Respondent, *v*. BENJAMIN GATES, Appellant.

The authority of a mother to give a valid consent to the binding of her
    minor child as an apprentice or servant, where the father is dead, or
    not in a legal capacity to give such consent, is not derived from the
    Revised Statutes, but existed previous to their enactment.

Her authority was, by the Revised Statutes, extended to cases of abandon-
    ment, or neglect to provide for his family by the father. (2 R. S., 154,
    § 2.) And in those cases only, was the certificate of that fact by a jus-
    tice of the peace of the town, indorsed on the indentures, requisite.

*Held*, accordingly, that where the father was dead, no certificate of the jus-
    tice was'necessary to render valid the mother's consent. ·

The peculiar doctrines and practices of the Shaker communities are not
    recognized by the courts as, *per se*, ground for taking from them the cus-
    tody of infants bound to them under the forms of law, and with the
    consent of the proper authorities.

The act of Congress, known as the internal revenue act, so far as it pre-
    scribes a rule of evidence, as to documents wanting a proper revenue
    stamp, is operative only in the federal courts, and has no application to
    the courts of a State.

(Argued October 18th, 1870; and decided October 25th, 1870.)

THIS is an appeal from an order made by the General Term
of the third judicial district, affirming an order made by Mr.
Justice MILLER, at Special Term, discharging an apprentice
on habeas corpus.

On the 8th of July, 1869, Mr. Justice MILLER, on the peti-
tion of the relator, issued a habeas corpus, directed to the
appellant, requiring him to produce the body of Marion S.
D. Barbour before the justice on the 15th day of July then
instant. The appellant produced Marion and made due
return to the writ, which was answered by the relator. The
matter was then referred to a referee to take the testimony,
who afterward made his report.

The evidence showed that before May 9th, 1866, the rela-
tor, with her two children Marion and Eliza, aged respectively
six and four years, went to live with the society of Shakers,
at Mt. Lebanon in the county of Columbia.

Statement of case.

That on the 9th day of May, 1866, the relator, her husband being then dead, bound her children, including the said Marion, to Benjamin Gates, one of the two trustees of the society. Marion remained with the society with the consent of the relator until the 21st of June, 1869, when the latter left them and reclaimed the custody of her child, which was refused.

Judge MILLER, holding Special Term at his chambers on the 15th of November, 1869, awarded the custody of Marion to her mother, holding the indenture, by which Marion was bound, invalid as to her, because the certificate of the death of the father of Marion was made by a justice of the town of Chatham, and not by a justice of the town of New Lebanon, where the indenture was executed, and because such certificate was not indorsed upon that paper, but another.

The facts appearing as to the certificate of the justice of the peace, were these : The relator had two minor children, Marion, and a younger one, both of whom were bound to the defendant at the same time. There was a separate indenture executed for each child. A certificate of a justice of the peace of the town of Chatham, certifying to the death of the father, was indorsed on the indenture of the younger child. No certificate was indorsed upon Marion's indenture. The town where the indentures were executed was not Chatham, but Lebanon.

There were no revenue stamps affixed to the indenture at the time of execution.

The defendant is an unmarried man, and without property.

The following account of some of the doctrines of the society was given in the testimony of one of its members taken before the referee :

The elders have the control of the family, under the supervision of the ministry ; the supreme head is the ministry. There is no such thing as marriage in the society.

Q. Is there any other authority of any kind and nature that you regard as superior to the orders and commands of the ministry ?  A. There is my own conscientious knowledge

of right and wrong, given me by Almighty God; there is no other rule that I regard superior to the ministry than my own conscience; I appeal, I suppose, to the same authorities that other Christian denominations do to ascertain the will of God.

Q. To what do you appeal? A. I pray to God and Jesus Christ for the same things that other Christians do; have heard Christians of other denominations pray; we use the Bible as other Christians do.

Q. Do you believe in any other revelation except that contained in the Bible? A. Our Bibles are bought at the book stores and Bible societies, and are the same as those used by other Christians so far as I know. We are spiritualists; to be a spiritualist implies that one believes in revelation given by spirits; that's Worcester's dictionary definition; we believe in revelations from spirits, and that there is such a thing as holding communication with spirits of deceased persons.

Q. Is the duty of confessing faults or sins to any particular person, or to one another, required or enjoined by the rules, order or usages of your church? Witness says: I decline to answer that question; it is too foreign to the subject.

Q. Is it required by the rules or orders of your church, or society, or family, that a violation of an order of the ministry be confessed to the elder, or some other officer of the family or society? A. That's our rule.

Q. You say you pray to God and to Jesus Christ; do you pray to any other person, or thing, or spirit? A. I do; I should pray to all the spirits of the just; I should not know what else to pray to; in the spirits of the just I also include the angels.

Q. Then you believe in other mediators than Christ? A. I believe in the spirits of the just made perfect, and in the angels.

Q. You believe Christ is a mediator between God and man? A. I do.

Q. Do you believe in any other mediator between God and man than Christ? A. I pray to spirits and angels, and approach God through that medium.

Q. Do you believe that Christ has been manifest in flesh? A. Yes, in Jesus of Nazareth.

Q. Is that the only time, according to your belief, that he was manifest in the flesh upon earth? A. By the word Christ, I suppose, we mean Saviour; there ought to have been a great many others in 1800 years that were capable of saving themselves and others from sin.

Q. Do you believe, or does your society believe, that there have been others than Jesus of Nazareth who have been capable of saving themselves and others from sin? A. We think there have been, and I think so.

Q. Will you be kind enough to name one that you, or your society, believe possesses that power? A. We think George Fox possessed the power of salvation for his sect, for all that professed his views and lived in righteousness according to his ideas.

Q. What relation does Ann Lee sustain to your church, according to the views of your church? A. We believe that Ann Lee holds the same relation to our church in the power of salvation that George Fox does to the Quakers.

Q. Do you pray to Ann Lee, and is she one of the persons to whom your church prays? A. She is one.

Q. Is it not enjoined as a duty, by the rules and orders of your church and society, to confess sins to a particular person, or some person or persons? A. It is.

Q. To whom are these confessions required to be made? A. That is one of the things that the ministry preside over; it is made to those whom they appoint; it is included in the duties of the elders.

Q. Do you believe, because George Fox was founder of the Quakers, and Ann Lee was of the Shakers, that they are the saviors of those that believe in them and are members of their church? A. Through the medium of Jesus of Nazareth; the saving power rested in him, Jesus of Nazareth.

Q. Which do you believe to be superior in saving power, Jesus of Nazareth or Ann Lee? A. Jesus of Nazareth; have had charge of teaching the children at Mount Lebanon;

have not now; this is the second summer I have not taught; Marion was one of the members of the school while I had charge.

Q. Were Marion and the other children taught by you the opinions and doctrines you have here stated as believed by you? A. They were.

*R. E. Andrews and Amasa J. Parker*, for the appellant, as to the want of the justice's certificate, cited *Pillon* v. *Hollenbeck* (9 Barb., 314); *In re McDowles* (8 Johns., 328). That, if indenture void, the only thing to be done on habeas corpus was to leave it to the child to decide with whom it would go, they cited *In re McDowle, supra; People* v. *Pillon* (1 Sandf., 679). As to the necessity of a revenue stamp on the indenture, they cited *Carpenter* v. *Snelling* (97 Mass., 455); *Steele* v. *Rush* (15 Pitts, L. J., 61); *New Haven Co.* v. *Quintard* (37 How., 29); *Vorebeck* v. *Roe* (50 Barb., 302); *Comp. Bk.* v. *Rouse* (13 Pitts, L. J., 280); *Burnap* v. *Laly* (1 Lansing, 111); *Day* v. *Baker* (36 Mo., 125); *Plessinger* v. *Dupuy* (25 Ind., 419).

*J. C. Newkirk*, for the respondent, on the question of the certificate of the justice, cited 2 R. S., 154, § 2; *Case of Squires* 12 Abb., 38, 43. As to the powers of the court in disposing of the custody of a child of tender years, he cited *People* v. *Cooper* (8 How., 288); *Wilcox* v. *Wilcox* (14 N. Y., 576); Crary's Pr., vol. 1, 389, 390; *People* v. *Erbert* (17 Abb., 395); *People* v. *Porter* (1 Duer, 709).

On the stamp question, he cited *Howe* v. *Carpenter* (53 Barb., 382).

ALLEN, J. The objection that the indenture could not be read in evidence, for want of a stamp, as prescribed by the United States internal revenue act, was not tenable. That act, so far as it prescribes a rule of evidence, is operative only in the federal courts, and has no application to the courts of a State. (*Carpenter* v. *Snelling*, 97 Mass., 452.) It is

not claimed that the instrument was void for the omission of the stamp.

The tender age of the infant at the time of entering into the apprenticeship, does not vitiate the indenture. The statute requiring her signature was complied with, and the capacity to bind himself or herself, with the consent of the proper guardian, is conferred upon every male infant, and every unmarried female infant under the age of eighteen years.

The disability of infancy is removed as to all infants, and the protection of the infant is cast upon the · persons or officers whose consent is required by the act (2 R. S., 154), and the courts, whose duty it might be to release infants from apprenticeship, ill advised and injudicious, and which would be pernicious to their interests. At common law, the parent may bind his infant an apprentice, and the statute simply controls and limits this authority, by requiring the infant to be a party to the deed. (Matter of McDowles, 8 J. R., 328.) Notwithstanding the age of the infant, her execution of the articles was a valid compliance with the statute. The certificate of the justice of the peace, made neces sary by the statute as one of the conditions upon which the mother can consent to the binding, is only required, when her power to act depends upon the abandonment and neglect to provide for his family by the father. (2 R. S., 154, § 2.)

The authority of the mother to act in such a case, was not first given by the Revised Statutes. Before that time, the mother could give the required consent, if the father was dead or was not in legal capacity to give such consent, and no certificate or preliminary evidence of such death or incapacity was required, neither was any memorial of such facts required in connection with the indentures. (1 R. L., 135, §§ 2 and 3.)

The legislature, upon the revision of the statutes, extended to the mother the guardianship of her children so as to authorize her to consent to the binding of them as clerks, apprentices or servants in the case of an abandonment or neglect to provide for his family by the father, and, either because such fact was not likely to be equally notorious and publicly known

as the other facts, upon the existence of which the authority
of the mother depended, or because there might be greater
danger of a fraud upon the right of the father, or for some
other or better reasons, satisfactory to the legislature, the
certificate of a justice of the peace of the town to the fact
was required.    There was no intention to embarrass the
mother in the exercise of the power which she had before
then exercised, or limit its exercise by imposing new forms
and requirements, and hence the provision was so framed
that the requirement of the magisterial certificate should
attach only to the last of the conditions precedent upon the
authority conferred, to wit, " the abandonment by the father
of his family, and neglect to provide for them."

The provision is in these words : " If he (the father) be
dead, or be not in a legal capacity to give his consent, *or if*
he shall have abandoned, and neglected to provide for his
family and *such fact be certified, etc.*".

The frame of the sentence clearly separates, and indicates
the intention of the legislature to distinguish between the
two clauses and restrict " such fact " in its application to the
last antecedent.    The court, therefore, erred in holding that
the indentures were void, for the want of a certificate of the
death of the father.    It is true, that notwithstanding the
validity of the indentures, it would have been competent for
the Supreme Court, if sufficient cause had been shown, to take
the custody of the infant from the defendant and commit
her to the care and nurture of her mother and natural guar-
dian.    This might have been done by reason of the unfitness
of the master to retain and have the training and education
of the child, or other causes, showing that the interest of
the infant required such transfer of custody ; and had the
decision of the court below been put upon such ground, it
would have been for this court to say, to what extent it would
review it, and sit in judgment upon this exercise of discretion.
It would have been the subject of review, but it is not pro-
bable that it would have been very closely scrutinized or
reversed except for manifest error.    But the decision is not

made to rest either at General or Special Term upon this ground. The judge, at Special Term, expressly says "that the child has been well taken care of by the person having her in charge," and that the evidence did not establish that there was any matter connected with the society to which the respondent was attached, which rendered it improper for her to remain there.

The judge, pronouncing the prevailing opinion at General Term, after, in substance, disposing of the case and holding that the indenture was void, and that the mother was not estopped from asserting her right to the custody of the child, was strongly inclined in favor of restoring the child to the mother, not because he believed its present guardian would not inculcate habits of industry, virtue and sobriety, but because of his belief that the welfare of individuals, of families and of society depend upon cherishing and preserving the family relation, and that the influence and tendency of the Shaker institutions was to alienate the affections of the child from its parents. But these views were not acquiesced, in so far as the record shows, by either of the other judges, and the affirmance of the order at Special Term was not based upon them. The most prominent among the doctrines and practices of the Shaker community, and which distinguish it from other communions and societies, are those of communism or a community of property among the members; there being no recognized individual or separate rights of property; and the celibacy and perpetual chastity of the individual members, together with an attempted and professed substitution of a general love and affection for all within the pale of the brotherhood, for the more limited and partial affections for relatives and kindred, with a suppression of all outward manifestations of partiality for kinsmen and friends.

These doctrines, based upon what are regarded by the mass of Christians as erroneous and fanatical views of the gospel, lie at the foundation of the order, and have been taught and practiced from its first existence. And yet the legislature and the courts have not thought that these pecu-

liarities of faith and practice were so obnoxious and detrimental to individual well-being or the public good as to deprive the members of the community of the care, education and training of children legally committed to their care and custody by parents and guardians. The legislature has not forbidden the binding of infants to them, and courts have refused to recognize these peculiarities as good ground for taking from them the custody of infants bound to them under forms of law and with the consent of the proper authorities. *In the matter of McDowles* (8 J. R., 328), *People* v. *Pillow* (1 Sandf. R., 672). It is conceded that the temporal wants of the children are properly cared for, and that they are educated to "habits of industry, virtue and sobriety," and this would seem to be all that the State could demand. There is an entire absence in this case of any evidence of the fitness or even of the ability of the mother to care or provide for this infant. There is no evidence that she has the means for its support, and certainly none that there has been any change in her circumstances or the circumstances and prospects of the child since she united with the Shakers and gave to them her child, which calls for an interference by the court, in the interests of the child, to annul the indentures.

Upon the case now made, the order appealed from must be reversed and the habeas corpus dismissed.

All the judges concurring but PECKHAM, J., who, having been a member of the General Term below, did not sit.

Ordered accordingly.