The Court.
What is the object of this paper %
Wm. P. Fiero, assistant district attorney.—First, I offer it in evidence to show that the defendant was a member of the Republican State Committee of the State of New York, was the treasurer of that committee, and that he admitted in that letter that he was liable for the actions of the committee, being a member of the executive committee also. It admits the character of his employment, as well, under the treasury department, and is an original letter.
The Court, on proof of the signature, overruled the objection and admitted the letter.
Parol evidence that the election included a member of congress was excluded on objection.
The secretary of the Republican State Committee, being called as a witness, was shown a circular issued by the committee over his signature, soliciting contributions “ for the purpose of defraying the necessary expense of the campaign,” and adding, “check or postal orders should be made payable to the order of Gen. N. M. Curtis, treasurer.”
Mr. Smith objected to this circular, on the ground that it did not affect the defendant, unless he were shown to have connected himself with it; that he was simply shown to have been a member of the committee, and it did not follow that he participated in every act of the committee,. or was made criminally liable by every act of the committee; that he could not be affected by anything that the committee did unless he was connected with it.
The Court.
This circular is admissible as a circumstance tending to show the purpose for which the money was contributed.
Mr. Fiero.
That is all for which I offer it.
Mr. Smith.
We object, that they should connect General Curtis with it, because as a matter of fact it *8 was issued without his knowledge, and I therefore object to its being put in, as something done without his knowledge.

Mr. Fiero.

It is only to show the purposes of the contribution.
The court permitted proof to be offered that there was such a circular in existence, as bearing only on the question of the purposes for which the money was raised.
To prove the payment of $5 by Vogelsang, the latter was called as a witness ; and to prove the giving of the check, which was payable “to the order of N. M. Curtis, treasurer of the Republican State Committee,” the teller of the bank was called to identify the check and to produce the signatnre-botik of the bank. By this witness, it appeared on cross-examination, that the deposit of this and other such checks was made to the credit of the Republican State Committee, that checks drawn on that account had to be countersigned by the chairman of the committee, and that the defendant’s individual check or his check as treasurer would not have drawn the money.
Mr. Fiero offered in evidence a copy certified by the secretary of state of the notice given under the New York statute, that an election would be held (1 R. S. 378, act passed in 1842).
Mr. Smith objected to this as immaterial: 1. If if • was material to show that a representative in Congress was voted for at the last election, it was material to aver it; and there was no such averment in the indictment. 2. If material to prove anything of that kind, this paper did not prove it.
The objection was overruled and the certified copy of notice adfnitted.
The appointments of Vogelsang and of Treichel respectively, were proved by letters of appointment from *9 the secretary of the treasury contained in the books of the custom-house, and by the oath as subscribed.
After some other evidence, not material to mention here, defendant’s counsel moved that a verdict of “not guilty” be entered on each of the counts.
The Court.
For the purpose of this trial, upon the motion made by the counsel for the defendant, I shall rule that there is evidence sufficient to sustain a finding of the averment of the indictment,, that the defendant was an employe, within the meaning of the statute. I am also of the opinion that the receipt of money by the defendant for the purpose of the Republican State Committee, under the circumstances, is within the prohibition of the statute, notwithstanding the fact that the defendant was acting as a member of that committee and the treasurer.
On the fourth count my opinion is that there can be no conviction.
In regard to the eighth count I am of the opinion that the variance is not fatal, and that the payment of the check by Treichel to the defendant was a payment of a thing of value within the meaning of the statute.
On the ninth count I am of the opinion there must be a verdict of not guilty.
Mr. Smith.
I understand your honor to rule not only that General Curtis was an employe, but that the others were also employes.
The Court.
I am under the impression that they are employes.
Benedict, J., charged the jury as follows:—The statute under which the defendant is indicted declares as follows: All executive officers or employes of the United States not appointed by the president, with the advice and consent of the Senate, are prohibited from requesting, giving to, or receiving from, any other *10 officer or employe of the government, any money or property, or other thing of value, for political purposes.
Under this statute this defendant has been charged by the grand jury with various offenses. The indictment contains eleven counts, and each of these counts is a separate and distinct charge, relating to a separate and distinct transaction. As to many of those counts no evidence has been adduced. As to others the rulings of the court have been such as to leave nothing for your consideration. Those are the second, third, fourth, fifth, sixth, seventh, ninth, tenth and eleventh'counts of this indictment. On those counts, therefore, the defendant is entitled to a verdict of not guilty at your hands, on each of them. The first and eighth counts of the indictment are, however, to be submitted to you.
These two counts to which I call your particular attention, as I have stated, charge two separate transactions.
The first count charges that the defendant, being an employe of the United States, received from Peter Vogelsang the sum of $5 in money for political purposes, Vogelsang being at the time, as the defendant well knew, also an employe of the United States.
There are five ingredients in this offense. The defendant must be an employe of the United States, not appointed by the president with the advice and consent of the senate. [The papers in evidence, and which are not controverted, show him to have held a position under the United States government, which in my opinion makes him an employe of the United States, within the meaning of this statute. You will have no difficulty upon that question.]*
Did the defendant receive $5 from Peter Vogel *11 sang, as charged ? The averment is specific, that he received at a certain time and place a certain sum of money. Money, in this averment, means lawful money. [This averment is supported by testimony that he received from Vogelsang $5 in United States , notes, commonly called greenbacks. You have heard the testimony upon that, the statement of the man Vogelsang, and will come to a conclusion as to how the fact was. Vogelsang says he paid $5, and he is not contradicted in what he says about the kind of money which he paid.
The defendant is shown to have been a member and the treasurer of the Republican State Committee. If Vogelsang paid the defendant this money, this was receiving the money by him within the meaning of the statute, although the defendant received the money as treasurer and for the committee.
It is no defense to say that he received the money as treasurer for the committee. The prohibition of the statute is against the receipt of such money by him in any capacity.]
The next question is, was the money received for political purposes \ The circumstances under which the money was received, and the purpose for which it was intended, are not really open to serious dispute ; and I charge you that an assessment levied by the Republican State Committee, in October last, for the purpose of defraying the expenses of that committee in the political campaign then pending, and received by the defendant for the purpose of so applying it, was received for political purposes within the meaning of the statute; and this, notwithstanding it may have been the defendant’s intention to place the money with the other funds collected by the committee for that purpose, and the fact being that he actually so placed it. -
The next question is, was Peter Vogelsang, at the time of the payment of this money, an employe of the *12 United States ? [The evidence shows that he was a messenger of the custom-house. If he was employed, as the papers before you indicate, then he was an employe of the United States within the meaning of this statute and the prohibition thereof.]
Lastly, did the defendant, when he received the money from Vogelsang, knew that Vogelsang was an employe of the United States ? For the purposes of this trial, I charge that such knowledge on his part must be found by the jury. Knowledge of such a fact as this can be proved by circumstances. It is not to be expected that the government will prove that the defendant saw Vogelsang’s appointment, or heard Vogelsang say, at any time, what his employment -was. But the jury may infer from circumstances, that the defendant must have known that Vogelsang was an employe of the United States.
The place, the acquaintance, what transpired between them, all the surrounding circumstances are to be resorted to, to enable the jury to determine whether the defendant knew, at the time when lie took this money from Vogelsang, that Vogelsang was an employe of the United States.
The eighth count differs from the first one, simply in this, that it charges a receipt of a certain check from another person, Charles Treichel. [There is evidence to show that Treichel was, what is sometimes called., assistant auditor, and I charge yon that if Treichel was holding the position which the papers in evidence show, then he was an employe of the United States within the meaning of the statute.]
This count charges the receipt of a check for $100 as an article of value, and 1 charge you that under the evidence you are justified in finding that he did receive an article of value from Treichel for political purposes, if you find that the check was paid for the purposes I have described to you in considering the first count.
*13 Under the eighth count and under the first count, the same ingredients are to be found by the jury ; the defendant’s employment; the receipt of money from Vogelsang under the first count, and the receipt of a check from Treichel, under the eighth count; that the receipt was for political purposes, and knowledge of the employment of the person from whom the money was received.
Upon each of these counts and each of these points you must be satisfied beyond a reasonable doubt. The burden is upon the government to prove each charge as laid. [The evidence which has been adduced is of so convincing a character upon these respective points,that if this were a civil case, I should direct a verdict. But the power of the court to direct a jury to find a verdict is never exercised in a criminal case adversely to the prisoner, and therefore I give you no such direction in this case.] I leave it to you. I state my opinion only for your aid and assistance, but not as controlling or as a direction. You must form your own opinion, for upon you and not upon the court is cast the duty of saying whether the defendant is guilty or not guilty of the charges in these two counts of this indictment.
With that duty, gentlemen, comes also attendant responsibility—no light responsibility. The responsibility upon a judge and upon a jury in a criminal case is never light, for the welfare of the community is largely affected by the administration of the criminal laws, and the republic suffers detriment whenever convincing proof of the commission of crime is not followed by the verdict which such proof demands. That responsibility now rests upon you, and upon each of you. I do not assume it for you. I leave you to render your verdict in the case as you find the facts proven. I warn you to dismiss all prejudice from your minds, if any there exists, either for or against this defendant. I *14 warn, you to dismiss any political considerations as affecting one or the other oí the two great political parties that divide the country.
You are to consider this case upon its own merits and according to its own facts, as those facts have been proved, upon the two issues which I have presented for your consideration. Take the case, gentlemen, and see to it that your verdict is such thát yon can go before your fellow citizens and say, each for himself: “It is a true verdict, according to the evidence.”
Defendant moved in arrest of judgment.
Edwin B. Smith (Stanley, Clarice & Smith, attorneys), for the motion.— I.The statute is a law against voluntary contributions for political purposes : and it is nothing else. It is a. statute de donis. It forbids subordinates to unite for the promotion of objects they approve: it does not prevent their superiors from using coercion to compel contributions for purposes the contributors may entirely disapprove. The constitution contains no clause, and no grant of power, upon which such a law, passed for such a purpose, can rest. Certainly, the authority for it is nowhere expressly given ; nor does careful scrutiny reveal to us anything from which it can be derived, even by the most strained inference. Compare the language, conferring legislative power, of the opening sections of the constitutions of this State and of the United States: also amendment X. of the latter. The differing phraseology indicates the difference in the authority with which each legislature is clothed. The legislature of New York is invested with very general legislative powers—to do anything which the constitutions (and natural justice) do not forbid. The congress of the United States is delegated with very limited legislative powers—to do nothing which the constitution does not first sanction (Calder v. Bull, 3 Dall. 387; People v. Draper, 25 *15 Barb. 359 ; Mason v. Waite, 4 Scamm. [Ill.] 134). By reason of these limitations, the legal presumption is, that any cause is without the federal criminal, jurisdiction, until shown to be within it. (Turner v. Bank of No. Am., 4 Dall. 11; State v. Sanford, 1 Noll & McC. 512). Article 1, section 4, of the constitution contains the first grant of legislative authority. It allows, to a limited extent, a revisory control over, and amendment of, the regulations made by the States with reference to the election of senators and representatives in congress. Authority over elections is circumscribed within the limitations of this section. There is none given over preliminary “campaigns.” The three succeeding sections (5, 6 and 7) relate merely to the forms of procedure in congress, the methods of organization, the compensation and privileges of its members. Section 8 contains, practically, an enumeration, of all the general, independent powers of legislation conferred upon congress (25 Barb. 359, cited ante). No section furnishes manifest'authority for this legislation. Nor can such authority be deduced from the general idea of national sovereignty, unless it is first shown that the United States is sovereign over the thing to which the enactment relates. Disregarding (as irrelevant) the provision as to exclusive legislation over particular places, it will be perceived that each grant of legislative power in section 8 is based upon some subject matter of appropriate federal cognizance, and not upon the existence of any relation of individuals to the government —with the single exception of those enrolled in the land or naval forces. The exception proves the rule. The reason for the exception is plain ; and where the reason does not apply, the exception is not made. The proposition cannot be sustained, that any act whatsoever of one in the civil employ of the United States may be made criminal, and the whole course of his life be regulated by congress, merely as an incident to the *16 fact of employment. Yet if congress can, because of this, employment, make criminal any act of a federal employee, outside the discharge of official duty, it may do so as to every act of his life. Either the nature of the relation, and the duties it imposes, must define and circumscribe the power of regulation and dictation by the superior, or else it is without limitation. The subject matter sets the bounds, which congress may not pass. No act, committed within a state, can be made an offense against the United States, “unless it have some relation to the execution of a power of congress, or to some matter within the jurisdiction of the United States” (United States v. Fox, 95 U. S. 672; Tennessee v. Davis, 100 Id. 260, 261). “Law, in its true sense,” says Judge Shabswood, “is the work of the mere will—not an act of intellectual caprice. It is a severe and necessary deduction from the relation of things ” (Prof. Ethics, 11). A federal statute, then, must be a necessary and proper deduction from the relation of things to the general government; and where its effect is to affix penalties to a theretofore entirely innocent or laudable act, the deduction must be severely drawn, the' necessity strict. “The propriety of a law, in a constitutional light, must always be determined by the nature of the- powers upon which it is founded. Gfen. Curtis is not charged with “receiving” this money in the course of, nor in violation of, official duty; nor in his capacity of “expert in pending suits;” but, on the contrary, it is truly stated, that he received it as a member of the Republican State Committee (of which he was treasurer), for the use of that committee, in the then pending campaign. So, too, the payment was not made, and is not alleged to have been made, by anybody in the course or violation of official duty ; nor because of employment in the government service. Each man paid as a member of “ the party known as the Republican party,” interested in *17 its success. True, the statute does not require, to incur its penalty, that the money should be paid or received in connection with the discharge of official duty; and it is precisely because the transaction has no relation to official duty, that it is something with which the federal government has, properly, nothing to do. Not having any “relation to the execution of a power of congress,” nor to any “matter within the jurisdiction of the United States” (95 U. S. 672), congress has no right to command in respect to it, and ought not to be obeyed. Its usurpations ought to be resisted. In no other way can the just limitations upon its authority be established. “ Ubi non est condendi auctoriias, ibi non est parendi necessitas” It is immaterial that both parties to the prohibited act are to be officers ox* employes of the United States. If mere employment is aground of federal criminal jurisdiction, it is enough that one is so employed. If employment is not a jurisdictional fact, it is of no consequence that both are officers or employees. Hitherto, the tendency of the act, with relation to duties imposed and powers conferred upon the nation by the constitution, has been the test of criminality. Anybody who interfered with its functions, whether personally connected with their proper discharge or not, is amenable to federal authority, civilly and criminally ; because he is a trespasser upon the domain set apart to the United States, and meddling with subjects confided to the safe-keeping of the Union. An examination of the statutes, from the Crimes Act of April 30, 1790 (1 Stat. 112-119) down, shows that this act of August 15, 1876, c. 287, § 6, is the sole instance in the entire legislation of the country of basing a conviction of crime upon the mere fact of the relation of the offender or the party injured to the United States, without regard to the effect of that act upon any subject-matter entrusted to the guardianship of the United States (See 1 Abb. U. S. *18 Pr. c. v. tit. “ Crimes,” pp. 406-461). In every other instance, the purpose has been to guard and promote the interests of the United States. If, incidentally, the functionary (mail-carrier, for instance) is protected in the discharge of his duty, it is simply in order that he may discharge the duty devolved upon him ; not that the individual be exempted from physical pain or mental annoyance (Osborne v. United States Bank, 9 Wheat. 865 ; United States v. Harvey, 8 Law Rep. 77; United States v. Parsons, 2 Blatchf. 104, 108 ; United States v. Gray, 2 Gall. 359 ; United States v. Hart, Pet. C. Ct. 390 ; United States v. Kirby, 7 Wall. 482 ; United States v. Sander, 6 McLean, 598, language of McLean, J., at p. 601). Jurisdiction cannot be established' by assuming that congress saw that the act enjoined or prohibited might have some possible effect upon a person’s capacity to discharge official duty. If it could, that jurisdiction would thereby be so amplified as to embrace everything which an official may do, or refrain from doing—not as an official, but as a man. Sumptuary laws may be passed, dictating what an officer or employe may, or may not, eat, drink, or wear, in order to be kept in a condition of health in which he can most efficiently perform the government’s work. It might be argued that unfortunate domestic relations impair, or happy ones promote, the capability for a prompt and proper discharge of official duty ; and thus be deduced a power to regulate the subject of the marriage and divorce of United States officers and employes. Such a chain of reasoning would be as logical as that which undertakes to bring the act of August 15, 1876, c. 287, § 6, under either of the grants founded in section 8, article 1 of the constitution. It is only laws “ necessary and proper ” to effect constitutional purposes, that congress is empowered to enact. It cannot determine conclusively for itself the existence of the necessity for, *19 nor the propriety of, its legislation ; otherwise its jurisdiction would be practically unlimited, instead of being restricted within comparatively narrow bounds. When by the passage of a law, on the one hand, and refusal to recognize its commands, upon the other, the issue of its necessity and propriety—and, consequently, of its validity—is raised, ft is one for judicial investigation and determination (Cooley Const. Lim. 44, 45, and notes; Lieber Civ. Lib. and Self-Gov. 162-164; De Tocqueville Dem. in Am. c. 6 ; Story on Const. § 1842; Marbury v. Madison, 1 Cranch, 176-178 ; Osborn v. United States Bank, 9 Wheat. 89 ; De Chastellux v. Fairchild, 15 Penn. St. 18, per Gibson, Ch. J.; Bates v. Kimball, 2 Chipm. [ Vt.] 77; Van Horne v. Dorrance, 2 Dall. 309 ; Bowman v. Middleton, 1 Bay, 252; Grimball v. Ross, Charlton [Ga.] 175 ; Beebe v. State, 6 Ind. 501, et seq.; Crouise v. Crouise, 54 Penn Ct. 263, affirming Jones v. Jones, 12 Penn. St., 356, 357; McCauley v. Brooks, 76 Cal., 39, et seq., per Field, Ch. J.; Bayard v. Singleton, 7 Martin [N. C.] 42. See also Mr. Webster’s speech on the Independence of the Judiciary, 3 Webster's Works, 39 ; Whittington v. Polk, 1 H. & J. 243). The legislature no more represents the sovereignty of the people than either of the other departments. All equally derive their authority from the same high source (Bailey v. Phila., &c. R. R. Co., 4 Harr. [Dell.] 402, 403). This court must say, then, whether or not the act in question is a law “necessary and proper” to carry into execution any vested power. Chief Justice Marshall’s authoritative definition of the above-quoted phrase is, of course, familiar. The summing up of his exhaustive discussion is : “Let the end be legitimate ; let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional” *20 (McCulloch v. Maryland, 4 Wheat. 421). In his Commentaries, Stoey says of this case, and of the language of the constitution: “It requires that the means should be, bona fide, appropriate to the end ” (2 Story on Const. § 1253, et seq.).
II. This statute does not seek—by appropriate means, adopted in good faith for that purpose—an end legitimate to be accomplished by federal legislation. The end sought must be determined from the terms of the statute itself, irrespective of theory (2 Story on Const. § 1268, last sentence; Attorney-General v. Sillem, 2 H. & C. 530, 531, per Bramwell, B. ; Adridge v. Williams, 3 How. 24; State Tonnage Tax Cases, 12 Wall. 217). Its plain and only purport is to forbid pecuniary co-operation among federal officers and employes of inferior grade—numbering (we are told, nearly 100,000 citizens—for any political purpose whatsoever, national, state, municipal, or other. A political purpose I understand to be a design to affect the government, or some branch,' or department, or subsidiary agency of it, in its administration, composition, or policy—whether by a change of men or of measures. “ All political power is inherent in the people i. e., in the people within the limits of whose sovereignty, determined territorially or otherwise, that power is to be exercised, and to which it pertains. In framing the federal constitution, the people delegated to the nation so.much power as they deemed sufficient (whether so in fact, or not, 92 U. S. 549) for the performance of its functions. The residue, with very important restrictions in their own behalf, they confided to the State governments. The boundary between the several States is territorial; between each of them and the nation, it is subjective; yet to the judicial perception, it is as well defined “as if the line of division was traced by landmarks and monuments visible to the eye.” (21 How. U. S. 516). Whatever *21 arbitrary power may attempt or accomplish, legally the barrier between the two jurisdictions is impassable, although the same persons may be subject to both. The “ political purposes ” of each are to be declared, attained, or sought, only by its people ; and, until our frame of government is changed, the people of the United States can constitutionally entertain and execute no purpose unless it relate to a subject of national jurisdiction. The primary test of criminality is, whether or not the act in question is prejudicial to the public (Broom Phil, of L. §§ 17, 164, 167) i. e., the public whose rights it affects. Except as the citizens are concerned in the execution of the few delegated powers, the United States have no public, outside the district and territories, &c. Elsewhere, and as to all other matters, the people are the State’s public. This dual relation must be constantly borne in mind, in considering the extent of the power of national legislation. It is entirely ignored in this statute (Read United States v. Cruikshank, 92 U. S. 549-551). Thus, every citizen is held obedient to two sovereigns. One sovereignty, however, can command only as to a few highly important matters ; as to everything else, its laws should be silent or unheeded. As to those matters, its injunctions are equally imperative to every citizen, whether holding official relation to it or not. True, there are some crimes which, as technically defined, none but an agent can commit. For instance, embezzlement, which in another would be larceny. Yet, the jurisdictional element (i. e., the misappropriation of government property), is the same in each case. Many similar instances might be cited. The sum and substance of it all is, however, that the United States, properly, only defines and punishes, as criminal, such acts as affect the proper discharge of its own functions. Evidently, the present law is not intended for any such purpose. Accepting the statements of its advocates, *22 its end is the protection of the individual, and not of the function. This is not “legitimate.” This law has no tendency to facilitate the collection of revenue ; the settlement or sale of public lands; the safety of the currency ; the prompt and proper delivery of the mails, or adjustment of accounts ; in short, any governmental purpose of the Union. It is purely personal in its design and operation. If the giving and receiving of value for political purposes is arbitrarily forbidden, and not in order to protect the officer or employe, it is still more illegitimate ; because it then loses all pretense of being in the interests of justice and freedom of action. As a protective measure, it is no more justifiable than an attempt to secure the person or property of an official from aggression in any other form. It is the province of the State to regulate the manner in which all property shall be acquired, held, used and transferred within her borders; whether by deed, will, gift, or otherwise (2 Kent Comm. 437). There is as little right in the general government, to regulate gifts within this State, as there is to declare a general law as to making other contracts. Without the consent of New York, the United States cannot even accept for itself the gift of property lying within our jurisdiction (United States v. Fox, 94 U. S. 315; 52 N. Y. 530). A fortiori, it cannot say that our own citizens, within our jurisdiction, shall not transfer property in that way, whether for political or other purposes. If one congress can say that our citizens, in federal employ, shall not give for a stated purpose (not federal), the next may, with equal authority, say such citizens shall give, for any purpose congress may choose to dictate. Concede all the hardship and evils incident even to the “levyingof political assessments;” yet the United States is not censor morum—except to the extent mentioned. In Wynehamer v. People, 13 N. Y. 386, Comstock, J., quotes and italicizes this sentence from Blackstone: *23 “Besides, the public good is in nothing more essentially interested than in the protection of every individual's private rights, as modeled by the municipal law." The police power regulates “ the intercourse of citizen with citizen ” (Cooley Const. Lim. *572; 1 Dillon Mun. Corp. § 141; Commonwealth v. Alger, 7 Cush. 82, 84-86). “In the American constitutional system, the power to establish the ordinary regulations of police has been left with the individual States, and it cannot be taken from them, either wholly or in part, and exercised under legislation of congress” (Cooley Const. Lim. 713, of last edition, citing License Tax Cases, 5 Wall. 471 ; United States v. De Witt, 9 Id. 41, and Patterson v. Kentucky, 97 U. S. 504; United States v. Reese, 92 U. S. 214; Railroad v. Fuller, 17 Wall. 568 ; United States v. Cruikshank, Id. 542; Munn v. Illinois, 94 U. S. 124,125 ; Railroad v. Husen, 95 U. S. 470, 471; United States v. Fox, Id. 672 ; Beer Co. v. Massachusetts, 97 U. S. 25; Fertilizing Co. v. Hyde Park, Id. 659 ; People v. Draper, 25 Barb. 374; S. C. on appeal, 15 N. Y. 562, 563; Gibbons v. Ogden, 9 Wheat. 203 ; N. Y. v. Miln, 11 Pet. 133, 134, 139 ; Slaughter House Cases, 16 Wall. 62, citing Thorpe v. Railroad, 27 Vt. 149). The State’s reserved right, to regulate the conduct Winter sese) of her citizens, is of too vital importance to be argued away by forced constructions or strained inference. “No interference by congress with the business of citizens, transacted within a State, is warranted by the constitution, except such as is strictly incidental to the exercise of powers clearly granted to the legislature” (5 Wall. 471), i. e., “ clearly incidental” to an express power, if not expressly given (9 Wheat. 204). The power to pass this law is not fairly deducidle from that “ to lay and collect taxes.” Certainly, it is not ‘ strictly incidental ’ to taxation. The consequence is too remote and too uncertain (United States v. De Witt, 9 Wall. 44,—where section 29 of the In *24 ternal Revenue Act of March 2, 1867, c. 169 [14 Stats. 484], punishing the sale of taxable oil inflammable at less than 110° Fahrenheit, was held to be a mere police regulation, not within congressional authority, and void). A like statute by a State held constitutional, although the oil was made under a United States patent (Patterson v. Kentucky, 97 U. S. 501, 503, et seq.; affirming Patterson v. Commonwealth, 11 Bush, 311; Veazie v. Moor, 14 How. 574, 575). For decisions analogous to 97 U. S. 501, et seq., see License Cases, 5 How. 573-632; Bartmeyer v. Iowa, 18 Wall. 129-141; Osborn v. United States Bank, 9 Wheat. 827, 828). The police power is one which the State cannot surrender (Beer Co. v. Massachusetts, 97 U. S. 33; Boyd v. Alabama, per Field, J., 94 U. S. 650; Met. Bd. v. Barrie, 34 N. Y. 667, 668). However important the object, real or assumed, of this legislation “yet it is equally important that there be no usurpation of jurisdiction ” (United States v. Cahill, 3 Crim. Law Mag. March, 1882, 197, cited infra). Moreover, this statute is an unwarrantable dictation as to a matter which vitally affects the State of New York as a body politic, for she is entitled to have them contribute, if they will, subject to no other restrictions than she may think it reasonable to impose. Hamilton says, of article 1, section 4 of the constitution: “ Its propriety rests upon the evidence of this plain proposition, that every government ought to contain in itself the means of its own preservation.....Suppose an article had been introduced into the constitution, empowering the United States to regulate the elections for the particular States ; would any man have hesitated to condemn it, both as an unwarrantable transposition of power, and as a premeditated engine for the destruction of the State governments % The violation of principle, in this case, would have required no comment; and to an Unbiased observer, it will not be less apparent in the project of sub *25 jeoting the existence of the National government, in a similar respect, to the pleasure of the State governments. An impartial view of the matter cannot fail to result in a conviction that each, as far as possible, ought to depend on itself for its own preservation” (Federalist, No. 59). “It is clear that no federal statute can interfere with voters except at an election for representatives in congress ; and then only as to their protection in voting for representatives in congress. Hence, it is essential to be charged in the indictment that, 6 at an election for representative,’ &c., the offense was committed ; and it is not sufficient to allege that 6 at an election at which a representative was voted for,’ &c. It may be that the election in question was for some other purpose, over which the federal government had no control, and with which it had no right to interfere ” (United States v. Cahill, per Treat, J., 3 Crim. Law Mag. March, 1882, pp. 196-198). Interference with a “ pending campaign” is obnoxious to the same objection as to meddling with a State election. The act is unconstitutional, because it violates natural right. “There are some things too plain to be written,” even in a constitution (Cooley, J., 24 Mich. 107, cited infra). ‘1 Written constitutions sanctify and confirm great principles, but the latter are prior in existence to the former ’ ’ (2 Webster’s Works, 392 ; 1 Blacks. Comm. 124; 2 Story’s Life, 278 ; Calder v. Bull, 3 Dall. 388 ; Wilkinson v. Leland, 2 Pet. 657. S. P., Bartmeyer v. Iowa, 18 Wall. 132, Miller, J.; Merrill v. Sherburne, 1 N. H. 213, per Woodbury, J., People v. Supervisors, 4 Barb. 74; Benson v. Mayor, 10 Barb. 244; Powers v. Bergen, 6 N. Y. 366; Goshen v. Stonington, 4 Conn. 225; People v. Hurlbut, 24 Mich. 107, et seq., cited supra ; Lee v. State, 26 Ark. 265, et seq.). • Freedom of speech and of the press is abridged (contrary to amendment 1), if every citizen cannot, at will, contribute to cause the speech to be made, in a suitable place j *26 and, when made, that it may be disseminated, to accomplish the ‘political purpose’ for which it is intended. Freedom of the press is not simply the right to print. It is, pre-eminently, the right to publish, which, necessarily, involves the right to receive aid, from whomsoever has the means and desire to give, that the publication may be effected. So, the right to assemble includes the right to 'hire Faneuil Hall, or any other convenient place, in which to hold the meeting; and the right of every citizen who makes one of that assembly, or chooses to aid its object (political or other) to give toward the hire of the hall, and other expenses. “The right to life includes the right of the individual to his body, in its completeness, and without dismemberment ; the right to liberty, the right to exercise his faculties, and to follow a lawful vocation for the support of his life ; the right of- property, tlie right to acquire, possess and enjoy it in any way consistent with the equal rights of others, and the just exactions and demands of the State” (Bertholf v. O’Reilly, 74 N. Y. 515, per Andrews, J.) This law is void, because it overthrows that equality of rights which belongs to every citizen. It denies to a class, a privilege which every other person possesses (Campbell v. State, 11 Geo. 353; Miller v. Sherburne, 1 N. H. 212, cited ante; In re Ah Chong, 2 Fed. Rep. 737, Sawyer, Ch. J.; In re Tiburcio Parrott, 1 Id. 481; Justice Washington’s opinion in Corfield v. Coryell, 4 Wash. C. Ct. 371; Ward v. Maryland, 12 Wall. 430; The Slaughter House Cases, 16 Id. 76, 77, 90 ; Ho Ah Kow v. Nunan, 5 Sawyer, 562 ; Sharswood Prof. Ethics, 20).
The act cannot be sustained by construing it to intend only contributors for federal purposes. (Compare Carpenter v. Snelling, 97 Mass. 452; Moore v. Quirk, 105 Mass. 51; People v. Gates, 43 N. Y. 40; United States v. Cahill, Treat, J., 3 Crim. Law. Mag. March, 1882, p. 197). First, because the *27 statute does not confine itself to “any election for representative or delegate in congress ”—nor, indeed, to an election at all; and second, because the indictment does not allege the transaction to be with reference to such, or to any, election or other subject-matter of federal jurisdiction. Congress cannot say that certain officers and employes shall not give or receive any money or thing for “political purposes” generally, and leave the court to construe it to mean “any federal purpose.” If this were competent, the indictment does not allege, nor the proof show anything of the kind. But it is not possible to separate the unconstitutional from the constitutional, if any part could be deemed so, United States v. Reese, 92 U. S. 221; United States v. Fox, 95 U. S., 672, 673. The constitutional limitations ought to be respected (18 Am. Law Reg. 676, 684, by Judge Cooley. Sharswood Prof. Ethics, 22, 23; Lieber's Civil Liberty and Self-Government, note to page 161, Woolsey’s ed. 1875).
II. It was error : 1. To admit defendant’s letter. The paper having become part of the public record, a copy (and not .the original) is the proper evidence. 2. So of the circular, which was not executed or issued with defendant’s consent, or knowledge. Its admission to show purpose of contribution was improper, because the real inquiry is purpose of reception by Curtis. A circular of which he was ignorant had no tendency to establish this fact. 3. So of the certificate or notice of election: A. Because the fact it was intended to establish was not averred in the indictment. B. It is no proof of an election: only that the secretary of state notified the sheriff of this county of one. C. It only purports to be a copy of a copy, and not from an original. It was compared with a copy, as the certificate also shows. 4. So of testimony that Mr. Treichel was “acting” as auditor. Proof that he acted in that capacity is not sufficient in a criminal case, even as *28 notice to Curtis. His later testimony, and written appointment, show that he was then only assistant-auditor, although in previous years he had been auditor, and is so again now. 5. So of the similar objection to Vogelsang’s statement of the position he held “in the collector’s office.”
III. The prosecution having left some elements necessary to constitute the crime [as charged] entirely unproved, it is a clear case for the interposition of the court” (People v. Bennet, 49 N. Y. 192; citing People v. Ruloff, 18 N. Y., 179; United States v. Fullerton, 7 Blatchf. 177; Reynolds v. People, 41 How. Pr. 179). The statute makes a distinction between “officers” and “employes” (Act of August 15, 1876, c. 287, § 6, 19 Stat. 169 ; Richd. Sup. 245 ; see section 5 of the same act (Rich. Sup. Id. 244). Other statutes make like discrimination (R. S. § 5484, and passim). If employe were broad enough to cover both, had not both been mentioned, the enumeration of these different classes of public servants requires the distinction to be observed in the indictment and proof under it (2 East Cr. L. 616, § 48 ; Loom’s case, 1 Moo. C. C. 160 ; Puddefoot’s case, Id. 247 ; Rex v. Douglas, 1 Camp. 212; Hooker v. State, 4 Ohio, 350; Alkenbach v. People, 1 Den. 80 ; State v. Copp, 15 N. H. 217 ; 20 Johns. 494.) The courts have defined the status of each. An officer must be appointed as the constitution requires, &c. An employe is hired from day to day, or as occasion demands (Compare United States v. Hartwell, 6 Wall. 385, with United States v. Germaine, 99 U. S. 508; United States v. Moore, 95 Id. 762; Twenty Per Cent. Cases, 13 Wall. 568). Each of the men named in the first and eighth counts held “an office,” with every single element which the supreme court has mentioned as going to constitute a man an “officer,” as contra-distinguished from an employe (99 U. S. 511). 1. *29 Peter Vogelsang was appointed by “ the head of a department.” This fixed his “tenure i. e., “manner of holding” (6 Wall. 393; 99 U. S. 511). He continued in office, regardless of any change of collector. He was paid a “salary,” by the year. This implies “duration” and “ emolument” (lb.). He held a specified position (messenger) with defined “duties” (lb.). It is immaterial that he was known as a “clerk.” A clerkship is a grade of office. Section 2644 of the Revised Statutes speaks of 1 ‘ clerks and other officers of the customs.” Hartwell was “ clerk,” appointed under the act of August 6, 1846, c. 90, § 13 (9 Stats. 62). Yet he was held to be an officer (6 Wall. 385). By section 2630 of the Revised Statutes deputy collectors “are declared to be officers of the customs yet their salaries, in common with those of the other officers known as clerks, are to be fixed by the secretary of the treasury (R. S. § 2634). Exhibit 21 abolishes certain “offices,” and discontinues “employes.” 2. All that is said above applies to Mr. Treichel, whether designated as auditor, assistant auditor, or clerk. It further appears, affirmatively, that he took an oath of “office.” But the indictment styles him as “auditor ” while he was “ assistant auditor.” This is a fatal variance. A lower grade of officer is called a clerk ; one particular clerk is styled and identified as an “auditor,” and another is identified as “assistant auditor,” with marked difference of rank and compensation (Reg. v. Bond, 1 Den. C. C. 517 ; 14 Jur. 390). Statements neither “foreignnor important ” must be proved as laid (United States v. Porter, 3 Day, 283, per Livingston and Edwards, JJ.; Clark v. Commonwealth, 16 B. Mon. 206 ; State v. Copp, 15 N. H. 217). That the allegation is under a videlicet does not relieve the prosecutor from the necessity of proving the fact he states, because it is “ an allegation of material matter” (1 Greenl. on Ev. § 60). Even if the use of a videlicet *30 permits the prosecutor to omit proof' of its averment, it does not allow him to prove the contrary of what it states. The allegation that Mr. Treichel was an “ employe” is not under a videlicet; and certainly could not be departed from if it were (People v. Allen, 5 Den. 79 ; Rex v. Johnson, 3 M. & S. 540). The variance between the description and the proof of the check he gave Gen. Curtis is fatal (Craven’s Case, Russ. & Ry. 14). It is alleged to have been “ payable to the order of him, the said Newton Martin Curtis.” It was payable “ to the order of N. M. Curtis, Treasurer of the Republican State Committee.” In law and in fact, so far as indorsing and obtaining payment of the check, and as to the right to its proceeds, these were different persons; different legal entities (United States v. Burroughs, 3 McLean, 405-409). Hence, the instruction asked and refused should have been given. Same remarks as above about the videlicet, with this additional suggestion ; that it certainly would never do to allege the giving of “a thing of value,” without alleging what it was, or indicating how it was valuable (1 Greenl. on Ev. § 60; McGuire v. State, 13 Smedes & M. 257; State v. Newland, 7 Iowa, 242; United States v. Brown, 3 McLean, 233; Commonwealth v. McGowan, 1 Met. [Ky.] 368 ; Commonwealth v. Smith, 6 Serg. & R. 568 ; Clark v. Commonwealth, 16 B. Mon. 206; State v. Farrand, 8 N. J. Law [3 Halst.] 333 ; United States v. Foys, 1 Curt. C. Ct. 368 State v. Hughes, 1 Swan [ Tenn.] 262 ; State v. Martin, 3 Murph. [N. C.] 533). 4. The paper put in by the government shows Gen. Curtis to have been an “officer.” At all events, non constat,,that he was an “employe;” and on the United States rested the burden of proving this. Certainly he was not an “ executive” employe (United States v. Meigs, 95 U. S. 748, 749); and the judge erred in ruling that “executive” in the statute does not qualify “employe.” Upon *31 page 8 of the record, it appears that Gen. Curtis’ letter to the secretary was received, against our objection, because “ It admits the character of his employment.” It expressly denies that he is “ an executive officer, or such an employe” as the statute describes. The very statute undér which he is indicted shows he was not a Special agent of the treasury department. He was “ an expert” in pending cases ; plainly a judicial servant (95 U. S. 748, 749).
IV. If Gen. Curtis received a bank-bill from Vogelsang, the indictment is not sustained (cases cited supra), for a bank-bill is not money. It is the “obligatory promissory note ” of the association (R. S. § 5182) which, and not the United States, issues it. Money means “legal tender;” the government’s, money (R. S. tit. XXXIX; Pryor v. Commonwealth, 2 Dana, 298 ; Williams v. State, 12 Sm. & M. 63 ; Hale v. State, 8 Tex. 171; Johnson v. State, Mart, & Yerg. 129; Garner v. State, 5 Yerger, 160; McAuly v. State, 7 Id. 526 ; Colson v. State, 7 Blackf. [Ind.] 591; State v. Jim, 3 Murph. [N. C.] 3; State v. Tillery, 1 N. & McC. 9-11). 2. No one can- read Vogelsang’s whole testimony and believe that he actually knew, as a fact, independent of inferential reasoning, whether he gave a greenback or a bank-note. It was error to say to the jury that “the evidence which has been adduced is of so convincing a character upon these respective points, that,.if this were a civil case, I should direct a verdict.” The language of the charge, together, on this subject, virtually took away a disputed question of fact from the jury.
S. L. Woodford, United States Attorney, and W. P. Piero, assistant, for the government, opposed.*—■ *32 I. The purposes for which the money was to be used are sufficiently stated in the indictment (Wharton' s Crim. Pr. & Pl. § 220; United States v. Pond, 2 Curt. C. Ct. 267; Phelps v. People, 72 N. Y. 334; 1 Bishop Crim. Pr. § 359 ; United States v. Jacoby, 12 Blatchf. 491; United States v. Mills, 7 Pet. 142; United States v. Lancaster, 2 McLean, 436; United States v. Andrews, 2 Paine, 451).
II. The statute is constitutional. It is competent for congress to prohibit the employes. of the government from creating a fund for political purposes, State or national, i. e., for the purpose of defraying the expenses, legitimate or otherwise, of any particular candidate or party,—and in so doing it does not unconstitutionally abridge the rights of any class of citizens, and does protect the constitutional rights of all citizens. The act does not abridge the freedom of speech, or of the press, or of religion, directly or indirectly (Jackson v. Walker, 5 Hill, 27). The judiciary should presume that there has been no transgression of power by congress (Commonwealth v. Smith, 4 Binney, 123; Munn v. Illinois, 94 U. S. 113, 123). Nor can a statute be declared unconstitutional and void, solely on the ground of unjust and oppressive provisions, or because it is supposed to violate the natural, social or political rights of the citizen, unless it can be shown that such injustice is.prohibited, or such rights guaranteed or protected, by the constitution (Cooley Const. Lim. 200). Congress has power to collect duties (Const. art. I. § 8, ¶ 1), to provide for the general welfare, and to make all laws necessary and proper for carrying into execution this power (¶ 18). It therefore has power to make laws regulating the qualification and conduct of employees (McCracken v. State, 27 Ind. 491 ; United States v. Marigold, 9 How. U. S. 560; Exp. Hennen, 13 Pet. 259 ; Avery v. Inhabitants of Tryingham, 3 Mass. 177; Legman v. Sutherland, 3 Serg. & R. *33 145 ; Matter of Bulger, 45 Cal. 553 ; Collins v. Tracey, 36 Tex. 546 ; McCulloch v. Maryland, 4 Wheat. 415; Martin v. Hnnter, 1 Id. 304).
III. The ends to be furthered by the law were for the public good (Hepburn v. Griswold, 8 Wall. 604; Metropolitan Bank v. Van Dyke, 27 N. Y. 400 ; Van v. Central P. R. R., 52 Cal. 63 ; Anderson v. Dunn, 6 Wheat. 215).
IV. Defendant, Vogelsang and Treichel are employes of the government (Gurney v. Atlantic & G. W. R’y Co., 58 N. Y. 358, 371; Twenty Per Cent. cases, 13 Wall. 572, 575; United States v. Germaine, 99 U. S. 508 ; United States v. Bell, 9 Ct. Cl. R. 313 United States v. Maurice, 2 Brockenbrough, 989 ; United States v. Hartwell, 6 Wall. 393).
V. The original letter was admissible.
VI. There was no variance (United States v. Howard, 3 Sumn. 12; Commonwealth v. Balkom, 2 Pick. 281 ; Commonwealth v. Vansickle, Brightly R. 69; Rex v. Warman, 2 Covington & K. 195 ; State v. Heek, 23 Minn. 549; 1 Bishop Crim. Pr. § 359 ; State v. Blaisdell, 33 N. H. 388 ; Bishop Stat. Cr. § 1038 ; Commonwealth v. Odlin, 23 Pick. 275 ; Commonwealth v. Ryan, 9 Gray, 137).
VII. The exceptions to the charge are untenable (Wharton Pr. & Pl, §§ 708, 711, 798 ; Duffy v. People, 26 N. Y. 588 ; Johnson v. Commonwealth, 85 Penn. St. 54 ; United States v. Anthony, 11 Blatchf. 200).
Everett P. Wheeler and Frederick W. Whitridge, of counsel for the government, opposed,—Cited in support of the indictment: Wharton Cr. Pr. & Pl. § 220; Phelps v. People, 72 N. Y. 334; United States v. Mills, 7 Pet. 142; Same v. Lancaster, 2 McLean, 436 ; Same v. Jacoby, 12 Blatchf. 491; Same v. Andrews, 2 Paine, 451. In support of the constitutionality of the act: United States v. Hudson, 7 Crunch, 32; Exp. *34 Bollman, 4 Id,. 93; McCulloch v. Maryland, 4 Wheat. 415 ; Martin v. Hunter, 1 Id. 304; Anderson v. Dunn, 6 Id. 215; Van v. Central P. R. R., 52 Cal. 63 ; Metropolitan Bank v. Van Dyke, 27 N. Y. 400; Matter of Jackson, 14 Blatchf. 245, 249; Exp. Nebold, 100 U. S. 371; United States v. Hendric, 2 Sawy. 476; Same v. O’Neill, Id. 481; Same v. Johnson, Id. 482.
Wallace, J.
While we have not overlooked the several rulings upon the trial which are impugned by the defendant, our principal attention has been directed to the point most strenuously pressed upon the argument, relating to the constitutionality of the act of March 15, 1876, upon which the indictment proceeds.
The act prohibits “all executive officers or employes of the United States, not appointed by the president, with the advice and consent of the senate,” from “requesting, giving to or receiving from any other officer or employe of the government, any money or property or other thing of value for political purposes.”
We cannot profess to be ignorant that this law was enacted in order to interdict practices which had become a topic of extended animadversion. But although it may have been aimed at the suppression of the practice which has prevailed among party organizations, of soliciting contributions for party purposes from their office-holding members, or exacting them by a moral coercion, and although its provisions may be well calculated to effect this object, it does not follow that it can be sustained as a legitimate means to that end. No person can be indicted under it for any other act than the one precisely designated. Whatever may have been the attendant circumstances, and however they may have qualified the moral complexion of the transaction, the person indicted can only be tried for doing *35 the thing which the statute prohibits ; and unless this of itself, isolated from all its concomitants, can be competently made a crime by Congress, the statute is nugatory.
It is insisted for the defendant that it is not within the constitutional power of Congress to make the giving or requesting or receiving of a voluntary contribution for political purposes by a subordinate government official, a criminal offense. It is to be observed, however, that the prohibition applies only when there is concerted action between officials in this behalf. The question then, is whether it is competent for Congress to prohibit cooperation between officials in the raising of funds for political purposes. Undoubtedly it is lawful for Congress to prescribe all needful regulations for the discipline of government officials, and to declare what infractions of discipline shall be treated as criminal offenses. The power to prohibit acts of officers or employees which are incompatible with the proper discharge of their duties, or which impair the efficiency of or tend to demoralize the public service, is essential to promote the end and object of government; and this power resides in the legislative department of the government.
In executing this power, Congress must of necessity exercise its judgment and discretion in determining what acts are or are not of such a pernicious character and tendency. This legislative discretion embraces a large field, and its boundaries cannot always be readily located. It is only when Congress has palpably transgressed the limits of its discretion that the judicial department will intervene. Such a case might arise if Congress should attempt to prohibit an act of a nature pertaining so exclusively to the sphere of private conduct that it could not by any implication impinge upon official deportment or official discipline. We are not able to say that the acts prohibited by the present *36 statute are of such a character. We cannot affirm that Congress transcended its discretion in prohibiting transactions between officials which create the relation of donor and donee, and introduce party interests into the public service ; nor that Congress erred in assuming that the influences springing from this relation and these interests, should be discouraged as liable to deflect the independence and impartiality which must rule official intercourse.
Many instances may be found in the laws of Congress where this legislative discretion has been exercised. It suffices to refer to one contained in the act of February, 1870, which prohibits any officer or clerk in the employ of the government from making any gift or present to an official superior/ It is not necessary to maintain that the cooperation of officials in raising funds for political objects, is essentially demoralizing to the public service or subversive of discipline; it is sufficient to justify the exercise of the legislative discretion if the prohibited acts tend to introduce interests which disturb the just equipoise of official relations. If it is suggested that it is the right and the. duty of every good citizen to aid in promoting such political objects as he deems to be wise and beneficial, and that Congress has no constitutional power to abridge that right, the answer is, that no citizen is required to hold a public office, and if he is unwilling to do so upon such conditions as are prescribed by that department of the government which creates the office, fixes its tenure and regulates the incidents, it is his duty to resign.
In reaching the conclusion that the statute is not obnoxious to the objections which have been suggested we have given force to the presumption in favor of its constitutionality, which it is the duty of the judiciary to apply to all legislative enactments. This presumption should prevail in all conflicts of interpretation and *37 all doubtful implications of constitutional power, so as, if possible, to sustain the validity of legislative action.
We have examined the minor points raised upon the argument and presented in the brief of counsel relating to the rulings upon the trial, but do not deem it necessary to discuss them. We think them to be without merit.
The motion in arrest of judgment and for a new trial is denied.
Benedict and Browh, JJ., concurred.

T'or the convenience of the reader, the passages to which defendant’s counsel took exception are indicated in brackets.

Tke views of the counsel for the government being sustained by the court, renders it unnecessary to take space for more than an outline of the argument, with the authorities.